DALE ENGINEERING COMPANY, Claimant, *v.* THE STATE OF NEW YORK.

## Claim No. 16176.

(State of New York, Court of Claims, January, 1921.)

**Constitutional law — unconstitutionality of Laws of 1919, chap. 459 — contracts — statutes — jurisdiction — Court of Claims — State Constitution, art. III, §§ 19, 28.**

Chapter 459 of the Laws of 1919, in terms conferring upon the Court of Claims jurisdiction to hear claims of certain highway contractors for losses due to increased cost of labor, material and transportation of material resulting from war conditions, is in violation of section 19 of article III of the State Constitution providing that the legislature shall neither audit nor allow any private claim or account against the state; and it is also in violation of section 28 of the same article providing that the legislature shall not grant any extra compensation to any contractor. (Smith, J., dissents.)

An advertisement for letting of a highway contract was published once between April 6 and April 17, 1917, namely, on April 16, 1917. The date therein advertised for the letting was May 7, 1917. Claimant's bid was dated May 7, 1917, and the contract was executed on May 9, 1917. *Held,* that the contract did not come within the terms of chapter 459 of the Laws of 1919.

The words in section 6 of the act " advertised for letting between April 6, 1917, and April 17, 1917," relate to the advertised date of letting and not to the date of advertising.

CLAIM against the state upon a contract for the improvement of a highway.

Hugh J. O'Brien (T. Harvey Ferris, C. R. Dewey, of counsel), for claimant.

Court of Claims, January, 1921.          [Vol. 114.

Arthur E. Rose, third deputy attorney-general, for State of New York.

ACKERSON, P. J.   On the 9th day of May, 1917, the above named claimant, the Dale Engineering Company, entered into a contract with the state of New York through the commission of highways, whereby said claimant agreed to improve a county highway in the county of Onondaga known as Jordan-Baldwinsville, part 1, county highway 1506, in accordance with the terms of said contract, and with the plans and specifications accompanying the same for the gross aggregate item prices of $63,995.75. The claimant completed the work under this contract, the highway was accepted by the state, and payment made therefor to the claimant by the state prior to May 7, 1919. The claimant alleges, and there is evidence in the case which tends to prove, that by reason of the declaration of war between the United States of America and the Imperial German government, and the acts of the government of the United States and of the state of New York consequent upon such declaration of war, and the conduct of such war, the cost of performance of the said contract to the claimant, the contractor, for labor, material and the transportation of material was increased in the sum of $27,405.98. It can readily be conceded that owing to the world war above referred to the claimant was confronted with a situation which made it much more difficult and expensive to perform its contract than would otherwise have been the case, but this in and of itself would have created neither a legal nor a moral liability on the part of the state to pay to this claimant any other or different compensation than that mentioned in the contract which was entered into on the 9th day of May, 1917. *Columbus*

*Ry. Power & Light Co.* v. *City of Columbus,* 249 U. S. 399.

The legislature of this state, however, by chapter 459 of the Laws of 1919, endeavored to relieve to some extent the alleged unfortunate condition in which many contractors with the state found themselves by reason of the increased cost to them of labor, material and transportation caused by the said war after they had entered into their contracts with the state. This act was entitled "An act authorizing the termination of certain highway contracts, conferring jurisdiction upon the court of claims to hear and determine claims and make awards for increased costs incurred in war contracts, and making an appropriation for the completion of unfinished work." It became a law on the 7th day of May, 1919.

By section 1 of this act, "war contracts" were designated as those which were made and executed prior to the 6th day of April, 1917, the date of the declaration of war between the United States of America and the Imperial German government, or those which were entered into after that date on bids submitted to the highway commission before said April sixth. Section 6 of the act extends the benefit of the act to still another class of contracts, namely, those contracts, the actual letting of which took place after the declaration of war on April 6, 1917, but before the introduction of the Draft Act in congress on the 17th day of April, 1917.

It will be seen, therefore, that the whole theory of this legislation was to compensate a contractor for the loss which he had suffered in performing a contract which he had entered into with the state before he had notice that the country was going to be involved in war during the time of the performance of the con-

tract, or at least before he had notice of the drastic provisions of the Draft Act which would necessarily very much limit his opportunities to get the necessary labor to perform his contract. It was apparently not the intention of the legislature to extend any relief to a contractor who, after war had been declared and after the Draft Act had been introduced in congress, deliberately and with his eyes open, with full knowledge that the country would be in turmoil and that the cost of labor and material and transportation would necessarily greatly increase in value, entered into a contract with the state to perform the necessary labor and furnish the necessary material to build a highway. When a man has notice of those things which, it is evident, must greatly increase the difficulties of his task, he has no one to blame but himself if he gets into trouble. The state, under such circumstances, could not be considered under any kind of an obligation to assist him. The contract in question was not made prior to April 6, 1917; it was not made upon bids submitted prior to April 6, 1917; it was not canceled or abrogated for non-performance, but was fully completed by the claimant as mentioned aforesaid. This contract, therefore, does not come within the provisions of section 1 of chapter 459 of the Laws of 1919. This contract was not let between April 6, 1917, the date of the declaration of war, and April 17, 1917, the date of the introduction of the Draft Act in congress, and, therefore, does not come within the provisions of section 6 of the aforesaid act. But this claimant on the 9th day of May, 1917, more than a month after the declaration of war between the United States of America and the Imperial German government, and more than three weeks after the 17th day of April, 1917, when the aforesaid Draft Act was introduced in

congress, signed and executed the contract in question with the state by which he obligated himself to furnish the necessary labor and material to build the highway in question. The officers of this claimant were then in full possession of the facts which must have made it plain to them that the performance of their contract would be accompanied with great difficulty and with greatly increased expense on all items of labor, material and transportation, and it was not the intention of the legislature that contractors, who were willing to take those chances and who signed their contracts with full knowledge of those facts, should later on be permitted to come in and make any claim against the state for the increased cost which they ought to have anticipated when they executed their contracts. And, therefore, we say, without any reference to the constitutionality of chapter 459 of the Laws of 1919, that the contract in question does not come within its terms and does not give this court, therefore, any jurisdiction of a claim against the state based upon such a contract.

The particular language upon which the claimant relies, however, and which it contends brings this claim within the benefit of the act, is found in section 6 in these words: "Including contracts advertised for letting between April 6th, 1917, and April 17, 1917, on estimates prepared by the Department of Highways prior to April 6th, 1917." The advertisement which resulted in the letting of this contract to claimant was published once between April 6 and April 17, 1917, viz., on April 16, 1917. The date therein advertised for the letting of the contract was thereby fixed as May 7, 1917. Claimant's bid or proposal, pursuant to such advertisement, was dated May 7, 1917, and the contract bears date May 9, 1917.

Claimant claims that it is the fact of the publication of the advertisement between April 6 and 17, 1917, which was intended by the legislature to be the test of whether a contract was to be entitled to the benefit of the act under the language above quoted.

I do not agree with that construction of the statute. In my view, the words " between April 6th, 1917 and April 17th, 1917 " relate to the advertised date of letting and not to the date of advertising. This seems to me to be the plain meaning of the language, apart from any other consideration, and is supported by the situation which confronted the legislature when the act in question was pending before it. April 6, 1917, was the date of declaration of war between the United States and the Imperial German government; April 17, 1917, was the date of introduction in the senate of the United States of the Federal Draft Act, of which fact judicial notice is taken. It was the passage and the consequences of the enforcement of the Federal Draft Act which claimant contends so disastrously affected the cost of performance of large construction contracts. No other reason is apparent or assigned for the fixing by the legislature of the period between April 6 and April 17, 1917, than the facts of the declaration of war and the introduction of the Federal Draft Act, and it is probable that that period was fixed with reference to those two events.

The freedom of action of claimant and other contractors was not and could not be affected by the mere fact of advertising a notice of the letting of highway contracts or by the dates of the publication of such advertising. The date advertised for letting, however, was of great importance to the contractor, for on or before that date his proposal must have been duly formulated and filed with the highway commission,

together with cash or a certified check equal to five per cent of the amount of the proposal as required in the information for bidders and in the public advertisement. If between the date of the declaration of war and the date of the introduction in the senate of the United States of the Federal Draft Act, a contractor had obligated himself by the filing of a proposal accompanied by cash or a certified check, the legislature evidently concluded there was some justice and equity in affording him relief from the consequences of so important a fact as the Draft Act, of which he had and could have had no knowledge at the time of making his proposal, and this, I conclude, is what was intended by the legislature.

If this is the correct construction of the statute, claimant is not within the benefit sought to be conferred by it, for the reason that the advertised date of the letting of this contract was May 7, 1917, on which date claimant's proposal was dated and submitted, and, therefore, I conclude that the court has not jurisdiction of this claim.

The state has not raised this question of jurisdiction nor asked for the dismissal of the claim on this ground. The court, however, feels it to be its duty, being of the opinion that it is without legal jurisdiction, not to assume it.

We now come to the question as to whether this act of the legislature is in violation of the provisions of the Constitution. Section 19 of article III of the Constitution reads as follows: " The legislature shall neither audit nor allow any private claim or account against the State, but may appropriate money to pay such claims as shall have been audited and allowed according to law."

One of my colleagues in his opinion holds that this

act of the legislature is contrary to the provisions of that portion of the Constitution. I agree with him and concur in the following language which he uses: " In the case at bar the Legislature not only allowed the claim, but directed the Court of Claims to compute the amount found due under such conditions and award judgment, the language of the act being that the Court of Claims shall determine the amount of the difference between the contract and the cost price, and award judgment. The Legislature cannot do indirectly what it cannot do directly."

The act places no burden of responsibility upon the court to determine either the legal liability or the moral obligation of the state. That has been determined by the legislature. All that is left for the court to do is to subtract the amount which would represent the cost of performance of the contract before the war from the amount which represents the actual cost of the performance of the contract and give the claimant an award for such proportion of that as under the terms of the act should be paid by the state. There is absolutely nothing judicial about the act that the court is called upon to perform. It is entirely administrative and clerical. Such being the case, the act is clearly in contravention of section 19 of article III of the Constitution.

We now come, however, to a more serious question than either of those considered above. This claim is one for extra compensation to this contractor. It is conceded to be such by both the state and the claimant. The Constitution, by section 28 of article III, provides as follows: " The legislature shall not, nor shall the common council of any city, nor any board of supervisors, grant any extra compensation to any public officer, servant, agent or contractor."

This is a solemn prohibition by the fundamental

law of this state, placed there for the protection of the funds of the people of the state, and which is absolutely controlling not only upon the legislature, but upon all the courts of the state. The claimant's counsel seems to think that the difficulty with which he is confronted in this provision of the Constitution can be easily evaded by the contention that it is not the legislature which is granting the extra compensation, but that it is the Court of Claims which is called upon to grant the extra compensation. Again I refer to the language of my colleague, above quoted, wherein he says: " The Legislature cannot do indirectly what it cannot do directly." The Court of Claims of this state is a creature of the legislature. It was instituted by a legislative act. The Constitution prohibits the legislature from awarding extra compensation to a contractor. And it contains no language authorizing the creation of a tribunal to award extra compensation. The provisions of the Constitution are not to be so easily evaded. If they could be, they would be of but little value. Our form of government can continue to exist only by maintaining in its integrity the Constitution upon which it is based. The Constitution can be maintained only by courts and legislatures which have the firmness to resist the assaults made upon it for either personal gain, or the public benefit, or in the cause of pure philanthropy. Such assaults must be overcome whether the motives which inspire them are good or bad.

The state of Wisconsin has a similar clause to this in its Constitution. Section 26 of article IV of the Constitution of the state of Wisconsin declares that the legislature shall never grant any extra compensation to any public contractor after the contract shall be entered into. The Supreme Court of that state, in the case of *Carpenter* v. *State,* 39 Wis. 271, uses lan-

guage which may well be borne in mind in passing on the present case. The court there said:

" For, in any construction of the statute before us, it assumes to compensate the plaintiff for all work and material under his contract, not at the prices of the contract itself, but at prices ascertained *dehors* the contract and by a rule wholly independent of the contract. Such compensation of a public contractor is prohibited by the Constitution." (p. 282.)

" The exact measure of his right is determined absolutely by his contract, under the constitution; and there exists no where a discretion to vary it." (p. 283.)

" Legislative history points and sanctions the policy of the constitution. It indicates the purpose of the section to save the legislature from the importunity of public contractors and servants, and the treasury from the discretion of the legislature in their favor; to limit contractors with the state, beyond pretense and device, to the precise compensation fixed by their contracts. Under this salutary restraint, no misfortune or rapacity can ever avail in a court of justice, by any artifice of circuity, to change the rule of recovery on a contract with the state. Where there is no fraud or mistake which would authorize a court to avoid or reform any contract, the contract itself must govern. If the compensation be too high, the state must bear the loss; if too low, the contractor must suffer it. The constitution leaves no room to legislature or court for equitable considerations of *quantum meruit*. We cannot say that the statute before us is not equitable; but we do hold that it is not constitutional." (pp. 284–285).

These words of the Wisconsin judge apply here with great force. This statute before us is remedial in its nature, and the end aimed at is undoubtedly justifiable,

but that it is in defiance of the plain mandates of the Constitution is sufficient to work its condemnation, no matter how laudable its purpose.

That the legislature cannot evade the prohibition placed upon it by the Constitution, by creating a tribunal, and then, without constitutional authority, delegating power to that tribunal to do what it cannot do itself, seems too plain for argument. Section 19 of article III gives the legislature such constitutional authority but section 28 does not. The Court of Appeals of this state, however, has clearly established that principle in a number of cases. Judge Allen in a very learned opinion in the case of *People ex rel. Bolton* v. *Albertson,* 55 N. Y. 55, used this very significant language: "A written Constitution must be interpreted and effect given to it as the paramount law of the land, equally obligatory upon the legislature as upon other departments of government and individual citizens, according to its spirit and the intent of its framers, as indicated by its terms. An act violating the true intent and meaning of the instrument, although not within the letter, is as much within the purview and effect of a prohibition as if within the strict letter; and an act in evasion of the terms of the Constitution, as properly interpreted and understood, and frustrating its general and clearly expressed or necessarily implied purpose, is as clearly void as if in express terms forbidden. A thing within the intent of a Constitution or statutory enactment is, for all purposes, to be regarded as within the words and terms of the law. A written Constitution would be of little avail as a practical and useful restraint upon the different departments of government, if a literal reading only was to be given it, to the exclusion of all necessary implication, and the clear intent ignored, and slight evasions or acts, palpably in evasion of its spirit,

should be sustained as not repugnant to it. The restraints of the Constitution upon the several departments, among which the various powers of government are distributed, cannot be lessened or diminished by inference and implication; and usurpations of power, or the exercise of power in disregard of the express provision or plain intent of the instrument, as necessarily implied from all its terms, cannot be sustained under the pretence of a liberal or enlightened interpretation, or in deference to the judgment of the legislature, or some supposed necessity, the result of a changed condition of affairs. (1 Kent's Com. 162; *Barto v. Himrod,* 4 Seld. 483; *Taylor v. Porter,* 4 Hill, 144; *Warner v. People,* 2 Den. 272; *People v. N. Y. C. R. R. Co.,* 24 N. Y. 485; *Schenectady Observatory v. Allen,* 42 id. 404.) ''

Judge Vann, in the case of *People ex rel. Burby v. Howland,* 155 N. Y. 280, quoted from this opinion of Judge Allen approvingly and in addition said on this subject: '' When the main purpose of a statute, or of part of a statute, is to evade the Constitution by effecting indirectly that which cannot be done directly, the act is to that extent void, because it violates the spirit of the fundamental law. Otherwise the Constitution would furnish frail protection to the citizen, for it would be at the mercy of ingenious efforts to circumvent its object and to defeat its commands.''

True it is, therefore, that the legislature cannot do indirectly that which it is prohibited from doing directly. Otherwise prohibitions in the Constitution upon the action of the legislature would be powerless to accomplish the object for which they were framed.

If the contention of the claimant is correct that section 28 of article III of the Constitution is a limitation upon the act of the legislature alone, then it is entirely unnecessary and is surplusage, because section 19 of

article III prohibits the legislature from auditing or allowing any private claim or account against the state whether it be for extra compensation or any other purpose. Section 19 then proceeds to authorize the legislature to appropriate money to pay such claims as shall be audited and allowed according to law. Section 28 of article III, it will be noted, however, contains no provision authorizing the audit and allowance of claims for extra compensation anywhere by anybody. It prohibits the recognition of that class of liabilities against the state, and does not provide any way that extra compensation may be paid to any public contractor. In other words, section 28 of article III is entirely a prohibition, and does not contain, within itself, any recognition that " extra compensation " can under any circumstances be constitutionally granted. This is in accordance with what Judge Rapallo said in his opinion in the case of *Cole* v. *State of New York*, 102 N. Y. 48, where he says, at page 54: " Where the creation of a particular class of liabilities is prohibited by the Constitution, it would of course be an infraction of that instrument to pass *any law* authorizing their enforcement, but in the absence of any such prohibition there is no good reason why the State should be powerless to do justice, or to recognize obligations which are meritorious and honorary and to provide tribunals to pass upon them." (The italics are ours.) In the case of *Cole* v. *State of New York* it appeared that the captain and harbor master of the port of New York and their employees were to be paid out of moneys raised by a tax on the ships in the harbor according to their tonnage. The Supreme Court of the United States held such law to be unconstitutional, and, therefore, the captain and harbor master put in a claim to the state for their salary under and by virtue of chapter 238 of the Laws of 1885 which conferred jurisdiction on the Board of Claims " to hear,

audit and determine" their claims for such salary. Judge Rapallo further said, in reference to this act: "It grants no extra compensation. It merely gives jurisdiction to hear and determine a claim for reasonable compensation for services rendered in a case where the compensation attempted to be provided by law failed by reason of the invalidity, under the Constitution of the United States, of the provision for such compensation." 102 N. Y. 59.

It seems plain to us, therefore, that the facts concerning the contract in question in this case do not bring it within the terms of chapter 459 of the Laws of 1919, so that even if such act is a valid exercise of legislative authority, this court would have no jurisdiction of this claim in any event. It further appears clear to us, however, as has been well expressed by Judge Morschauser, that this act is in direct violation of section 19 of article III of the Constitution which prohibits the legislature from auditing or allowing any private claim against the state. It is apparent that this is just what it has done by this act. For this reason, therefore, if for no other, the act is unconstitutional, and the claim must be dismissed. But it appears further that the subject upon which the legislature has attempted to act here has been placed beyond its jurisdiction by the Constitution itself. The prohibition in the Constitution, as set forth in section 28 of article III, is not only binding upon the legislature but upon the courts of the state as well. That section places it beyond the power of the legislature or of any tribunal to make an award to any public contractor in this state for extra compensation. That provision of the fundamental law can neither be ignored nor evaded. Without it, public contracting would be reduced to a farce. The public treasury would be the **constant object of attack by every public contractor**

who, through misfortune or ignorance, had lost money on his contract. It would also be the constant object of attack by every public contractor whose rapacity for money was strong enough to throttle his integrity and induce him to commit fraud. The state, it is true, may recognize a moral as well as a legal liability. It may authorize the Court of Claims to determine whether the claim of a claimant is a moral obligation against the state, and, if so, to render such an award as shall be just and equitable in the premises, but it has no power either itself to recognize or to authorize the Court of Claims to recognize any claim for extra compensation. The claim before us must, therefore, be dismissed.

SMITH, J. (dissenting in part). I think the decisions of the courts compel the conclusion that, if chapter 459 of the Laws of 1919 is not in contravention of section 28 of article III of the State Constitution, it does not violate section 19 of article III or section 9 of article VIII, for it does not in terms or effect audit or allow any claim against the state, and, if there exists against the state and in favor of the contractors for whose relief the act in question was passed a moral and equitable obligation, though not a legal one, the payment of the money of the state in discharge of such obligation, pursuant to the provisions of an act of the legislature in other respects valid, would not be a gift or gratuity within the meaning of section 9 of article VIII of the Constitution. *Cayuga County* v. *State of New York,* 153 N. Y. 279; *Munro* v. *State of New York,* 223 id. 208.

I conclude also that the act is not in contravention of section 28 of article III of the Constitution. Of course, if contractors are permitted to recover by virtue of its provisions they will have received extra com-

pensation, because they will have received compensation over and above that fixed by their contracts when the labor and materials were furnished (*Matter of Mahon* v. *Board of Education,* 171 N. Y. 263, 266), but such extra compensation has not been granted by the act, the meaning and effect of which is merely to refer such claims to this court to be heard and examined upon legal evidence to the end that this court may determine whether or not in conscience, equity and justice the state should pay any amount, and if so what amount, on account of the facts alleged in the claim and proven on the trial, the legislature having by the act waived legal defenses to the extent specified in the act.

The section of the Constitution under consideration does not provide that no contractor shall receive any extra compensation, or that the state shall not grant, allow or pay any extra compensation, but merely that the legislature shall not do so. The act contains no language expressly granting any compensation, extra or other, to any contractor, but is a general act declaring a policy of justice and equity to those who under extraordinary war conditions have expended moneys for the benefit of the state in amounts far greater than the state was legally bound to repay, and provides for payment only if and when this court shall by its judgments establish valid claims.

It is urged by the state that the statute by its terms leaves nothing to the court to be judicially determined but commands the court to render the exact judgment directed by its terms. When, however, the act is read and construed in the light of the law as declared in *Munro* v. *State of New York,* 223 N. Y. 208–214, and the word " shall " in the twelfth line of section 6 read as " may " in conformity to the rule there enunciated and applied, it appears that the court is not commanded, but authorized and permitted to render judg-

ment in such cases, and to fix the amount of the recovery, restricted, however, by the limitations expressed in the act.

Attention has been called to the fact that the act under consideration does not, as did the act construed in the *Munro Case, supra,* in terms confer upon the court jurisdiction to determine, but merely to hear, such claims. This circumstance I regard unimportant. Jurisdiction to hear necessarily implies authority to determine. Hearing without determination would be idle and futile and the legislature cannot be held to have intended an idle ceremony. *American Bank Note Co.* v. *State of New York,* 64 App. Div. 223, 227.

Attention has also been called to the fact that the act construed in the *Munro* case by its terms authorized the court to render judgment for such sum as shall be "just and equitable," whereas in the act under consideration the words "just and equitable" or equivalent words are not used and it is argued that hence the court has not been authorized to determine as to the justice and equity of such claims, but that the legislature itself has determined the justice and equity of the claims in advance, and in favor of claimants, leaving to the court only the duty of computing the amount of the judgment to be rendered. I do not so read the statute.

Jurisdiction to hear and determine includes power to determine and decide every question necessarily involved in the case being heard. The words "The Court of Claims shall (may) determine the increased cost * * * and render judgment against the state for the amount so determined as chargeable to the state" confer power and authority to allow or reject claims in whole or in part and in considering whether they are to be allowed, to take into consideration principles of equity and common justice, disregarding

purely legal defenses to the extent permitted by the act. *Cole* v. *State of New York,* 102 N. Y. 48, 52; *Munro* v. *State of New York,* 223 id. 208, 213.

There is abundant authority to support the power of the legislature by appropriate enactments to recognize the moral and equitable obligations of the state to the extent of referring them to this court for examination and determination and allowance if the facts shall establish a moral and equitable ground for recovery, though the legislature is forbidden by the Constitution to itself audit and allow such claims. *Board of Supervisors of County of Cayuga* v. *State of New York,* 153 N. Y. 279; *Cole* v. *State of New York,* 102 id. 46; *O'Hara* v. *State of New York,* 112 id. 146; *Wheeler* v. *State of New York,* 190 id. 406; *Lehigh Valley R. R. Co.* v. *Canal Board,* 204 id. 471; *Munro* v. *State of New York,* 223 id. 208.

I have not overlooked *Matter of Mahon* v. *Board of Education,* 171 N. Y. 263. The statute there considered (Laws of 1900, chap. 725) made no provision for the hearing and determination of the claims of the retired teachers to a pension, but the right to the pension and the amount thereof were determined by the direct action of the legislature; hence the act was held to be in contravention of section 28 of article III of the Constituton.

However, I concur in the opinion of Presiding Judge Ackerson that this court is without jurisdiction to make an award in claimant's favor upon this claim for the reason that chapter 459 of the Laws of 1919 does not apply to claimant's contract nor to this claim, and, therefore, that the claim should be dismissed.

MORSCHAUSER, J. (concurring). The claim herein is made by a contractor who has had a contract for the construction of a public highway with the state to build a state road. The claim is filed under chapter

459, Laws of 1919, commonly known as the Knight Act. Section 6 confers jurisdiction upon the court, and reads as follows:

" § 6. Jurisdiction is hereby conferred upon the court of claims to hear all claims for alleged increase in the cost of labor, materials or transportation of materials incurred after April sixth, nineteen hundred and seventeen, in the doing and performance of war contracts which have been completed, accepted and for which final payment has been made, including contracts advertised for letting between April sixth, nineteen hundred and seventeen, and April seventeenth, nineteen hundred and seventeen, on estimates prepared by the department of highways prior to April sixth, nineteen hundred and seventeen, and also of any war contract terminated under the provisions of this act. The court of claims shall determine the increased cost, whether the whole or a part, which is properly chargeable against the state and the portion of such increased cost, if any, which may be paid by a subdivision or subdivisions of the state as hereinafter provided on the basis on which the state and the subdivisions of the state were obligated to pay for the work done under the contract and render judgment against the state for the amount so determined as chargeable to the state, which judgment shall be paid as other judgments against the state are paid. No judgment shall be rendered, however, for an amount greater than thirty-five per centum of the contract price of labor, materials and the transportation of materials furnished or supplied during the year nineteen hundred and seventeen, nor greater than fifty per centum of the contract price of labor, materials and transportation of materials furnished or supplied during the year nineteen hundred and eighteen. No claim for relief under this section shall be main-

tained against the state unless the claimant shall file his claim within six months after his right of action shall accrue under the provisions of this act. Any subdivision of the state is authorized and empowered to raise by taxation or by an issue of its obligations such an amount as may have been found by the court of claims to be the proportion which said subdivision may pay for the increased cost as so determined, and to pay said amount to the contractor entitled to receive the same.''

Among other defenses made by the state, it challenges the constitutionality of the Knight Act and asserts that the same is unconstitutional under the provisions of section 19, article III, and section 28 of article III of the New York State Constitution. Section 19, article III, reads as follows: '' The legislature shall neither audit nor allow any private claim or account against the State, but may appropriate money to pay such claims as shall have been audited and allowed according to law.''

Section 28, article III, reads as follows: '' The legislature shall not, nor shall the common council of any city, nor any board of supervisors, grant any extra compensation to any public officer, servant, agent or contractor.''

Both section 19 and section 28 of article III were recommended by the Constitutional Convention in 1867 and were adopted and became a part of the provisions of the Constitution in 1874. In addition to these amendments of the Constitution, sections 6 and 9 of article VII and sections 9 and 10 of article VIII were all under discussion by the Constitutional Convention of 1867 and were all adopted in 1874, and in that year became part of the Constitution of the state of New York. All of these sections were amendments to the Constitution and were adopted in 1874 to remedy the

many evils of special legislation, which had grown so extensive as to become a public scandal. Prior to the adoption of these amendments the power of the legislature was not restricted, so that it could pass private bills (or change the terms of a contract) or increase the pay of contractors, increase salaries and do many things that these amendments were intended to prohibit, and before these amendments special legislation became subject to great abuses, which the various amendments above named to the Constitution were intended to remedy. After the adoption of these amendments to the Constitution and after they became a part of the Constitution of the state there arose many instances in which the state, recognizing its moral obligation, where in its judgment justice and right demanded it, by enactments through the legislature conferred jurisdiction on the Board of Claims, and afterwards the Court of Claims, directing them to disregard legal defenses and award judgment against the state, if the court found that the claim was founded on equity and justice, although the claims were not such as could have been enforced in a court of law. if the state had not been immune from suit. Under such circumstances many enabling acts have been passed by the legislature; and the several amendments of 1874, above named, have been the subject of judicial construction, arising out of claims presented under such special legislation. Almost without exception the courts have held in such cases such enabling acts to be constitutional and not in violation of the provisions of the various amendments, if the claim and demand against the state was one founded on justice and equity. *Munro* v. *State of New York,* 223 N. Y. 208; *Lehigh Valley R. R. Co.* v. *Canal Board,* 204 id. 471; *Trustees Exempt Firemen's Benev. Fund* v. *Roome,* 93 id. 313; *Wheeler* v. *State of New York,* 190

id. 406; *Matter of Boston & Albany R. R. Co.,* 64 App. Div. 257; 170 N. Y. 619; *Oswego & Syracuse R. R. Co.* v. *State of New York,* 186 id. 384; affd., 226 N. Y. 351; *Cole* v. *State of New York,* 102 id. 48.

But in no instance where the enabling act was passed in aid of any one who rendered services to the state or who was entitled to recover from the state did the legislature assume to determine the question of the equity or justice of such a claim, but submitted it to a tribunal to *hear, audit and determine,* and usually conferred jurisdiction upon the Court of Claims and invested such tribunal with judicial powers to determine the equities and justice of a claim so presented, and permitted it to decide such questions. The state, recognizing its moral obligation, could at all times do justice even though it had a legal defense to claims presented, and the courts have uniformly held that under such circumstances the amendments to the Constitution of 1874 did not prevent the state through its legislature from enacting laws whereby these claims could be submitted to some tribunal for determination. The legislature itself could not make such determination, and, therefore, jurisdiction to make such determination and hear the claim and audit and determine the same was usually referred to its tribunal known as the Court of Claims, created for that purpose. The legislature could not in any orderly way, such as the taking of testimony and the observation of legal rules governing evidence, determine these questions. By referring it to the Court of Claims there was an orderly way of determining it upon evidence, and the right to appeal and review was provided by the Code. And where this was done, the courts have uniformly held that such enabling act conferring such jurisdiction was not in violation of the **constitutional provisions above named.**

At the time of the declaration of war of the United States with the Imperial German government, the state of New York was under contract with many contractors to build or repair state highways. This war created a great demand from the ranks of labor for men and great increase in the costs of labor and material and in the costs of transportation; industries were converted into ammunition factories and all labor was either used in the manufacture of ammunition and other articles used in the war or the laboring man was converted into a soldier; railroads were busily engaged in transporting war necessities, with the result that the costs of all labor and material were greatly increased. The war and these conditions were not contemplated at the time the contractors entered into the contract for the improvement or construction of highways, and it certainly never was intended by either contracting party to be one of the hazards usually encountered in the carrying out of contracts; and the contractor when making his bid could not be expected to anticipate such a condition; and the costs of material, labor and transportation after the war reached such a high mark that to compel the contractor to complete his contract would mean in many cases absolute bankruptcy for him.

While it is a well-settled rule of law that a person may be relieved from an obligation of his contract when it becomes impossible of performance or when such performance has become impossible on his part by some superior force without his fault, it was nevertheless held in *Columbus Railway, Power & L. Co.* v. *Columbus,* 249 U. S. 399, that the high cost of labor and the increased costs of material and transportation brought about by the World War, did not make a contract impossible of performance and was not such superior force as to prevent its performance.

Justice Day in writing the opinion for the court, among other things, says: "It certainly was not intended to question the principle, frequently declared in decisions of this court, that if a party charge himself with an obligation possible to be performed, he must abide by it unless performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties will not excuse performance. Where the parties have made no provision for a dispensation, the terms of the contract must prevail. * * * The latest utterance of this court upon the subject is found in *Day* v. *United States,* 245 U. S. 159, in which it was said: 'One who makes a contract never can be absolutely certain that he will be able to perform it when the time comes, and the very essence of it is that he takes the risk within the limits of his undertaking. * * *'"

In that case one of the contracting parties sought to enforce the contract against the other party, and the effect of this decision was that the World War and the condition created by it did not excuse either contracting party from fulfilling the obligations of his contract.

In the case on trial before this court, while the question arose between the contracting parties, one of the contracting parties, namely, the state of New York, by legislative enactment did relieve the other party from carrying out his contract and relieved him from his obligations thereunder which were brought about by the World War, as chapter 585 of the Laws of 1918, commonly known as the Walters Act, permitted the state upon consent of the contractor to terminate such contracts, and if the state had not by legislative enactment waived the performance of the contract, under the decision in *Columbus Railway, Power & L. Co.* v. *Columbus, supra,* the conditions created by the World

War would not have permitted the contractor to abandon his contract.

We think the legislature had the power to allow any contractor who had a contract with the state, with the consent of the contractor to cancel the same. As was said in *People ex rel. Williams* v. *Dayton*, 55 N. Y. 374: "No constitutional provision can prevent a failure, on the part of the contractor, to perform his contract nor his abandonment of it; and it is conceded that the legislature may cancel or authorize contracts to be canceled." And we think that the legislature had such power if assented to by the contractor, and that the legislature could go further and confer upon the Court of Claims jurisdiction to *hear, audit and determine* the equities of the claim and, if the state should as a moral obligation by reason of the World War pay the contractor the difference between the stipulated price under the contract and the increased cost, allow the Court of Claims to do so. This the legislature attempted to do by the enactment of chapter 459 of the Laws of 1919, commonly known as the Knight Act. Had the legislature done so we do not think that the provisions of the Constitution named would have been violated. But by the Knight Act the legislature did not confer jurisdiction upon the Court of Claims to *hear, audit and determine* the claim. It simply directed that the Court of Claims shall determine the difference in the cost and then commanded the Court of Claims to award judgment for such sum in favor of the contractor. While it states in the act that the Court of Claims shall *hear* the claim, it nowhere confers any jurisdiction to *audit* and *determine* the same, but simply directs that the Court of Claims shall make a computation of the difference in the cost and determine the amount thereof and then award judgment against the state and in favor of the

17

contractor for the amount so ascertained. The legis-
lature by the Knight Act assumed to decide the
equities and the moral obligation of the state, and left
nothing for the Court of Claims to do except to com-
pute the amount. This, we think, is precisely what
the amendments to the Constitution intended to pre-
vent the legislature from doing. While the state was
ready to do equity and observe its moral obligation,
the decisions hold that the question as to whether a
claim presented against the state should in good con-
science be paid and whether there was any moral obli-
gation upon the part of the state in equity and justice
to pay the same although the state may have had some
legal defense, should always be submitted to a consti-
tuted tribunal with judicial functions so that the matter
could be judicially determined and properly reviewed
upon appeal. This principle of law is clearly stated
by Judge Rapallo in *Cole* v. *State of New York,* 102
N. Y. 51. In this case the claimant, while acting
as a captain and harbor master of the port of New
York, rendered certain services to the state of New
York, which he was authorized to do by chapter
436 of the Laws of 1860 and it was afterwards deter-
mined that he could not be legally paid for such serv-
ices. He having rendered services to the state, the
legislature by chapter 238, Laws of 1885, conferred
jurisdiction upon the Board of Claims to *hear, audit*
and *determine* such claim. The act was challenged as
being unconstitutional and in violation of section 19,
article III, of the New York State Constitution. Judge
Rapallo, writing the opinion for the court, says:

"It is apparent that the act does not come within
the prohibition against the *auditing* by the legislature
of any private claim. The act does not purport to
audit the claims. This the legislature could not do,
however just the claim, or however legal it might be

if preferred against an individual. The Constitution prohibits the legislature from exercising the power of *itself* auditing claims, which is in its nature judicial, but provides for the payment of claims which shall have been audited or allowed according to law; thus recognizing the power of the legislature to provide by law for the auditing and allowing by some appropriate tribunal of claims against the State.

" It is contended, however, that the act does come within the prohibition against *allowing* claims against the State.

" It must be observed that the act of 1885 does not even assume to *allow* these claims. It simply submits them to the arbitrament of the board of claims, a judicial body established for the purpose of passing upon claims against the State. It gives jurisdiction to that tribunal to *hear* and *determine* those claims, but does not dictate how it shall decide upon them. The only limitation upon the power of the board to decide is, that it shall confine itself to a reasonable compensation for services performed and expenses incurred during the year specified. Under the authority conferred by the act, that tribunal, if it deemed the claims unjust, might have rejected them in toto. The power to hear and *determine* includes power to reject as well as to allow. Construing the constitutional restriction literally, it was not violated by giving to the board jurisdiction to hear and determine. The enactment was consequently purely legislative and in no sense an exercise of judicial power.

" It is contended, however, that the enactment was violative of the spirit and intent of the constitutional prohibition, if not of its letter. That it was intended not merely to prevent the legislature from itself acting judicially in passing upon private claims, but from passing any law under which a private claim could

be recognized by or established against the State, however just and equitable it might be, unless it was founded on a legal liability which could be enforced by the courts of justice against an individual or a corporation. We find no such restriction upon the legislative power in the State Constitution. The act establishing the board of claims (Laws of 1883, chap. 205, amended by Laws of 1884, chap. 60) confers upon the board jurisdiction to hear, audit and determine all private claims which shall have accrued within two years, except such as are barred by existing statutes. But that restriction was imposed by the legislature and is subject to modification by it.

"The statute of limitations and other legal defenses are, under the general law, available to the State as against a private claim preferred to the board of claims, and as a general rule it has been considered that the authority of the board is confined to the allowance of *legal* claims. But can it be maintaned that it would be beyond the power of the legislature, in special cases, where in its judgment justice and right demanded it, to give power to the board of claims to disregard defenses strictly legal? We are unable to find in the Constitution anything which deprives the legislature of the power of giving to the board of claims, or any other proper tribunal, jurisdiction to hear and determine claims against the State which are founded in right and justice, solely for the reason that they could not be enforced against an individual in the courts. * * *

"Where the creation of a particular class of liabilities is prohibited by the Constitution, it would of course be an infraction of that instrument to pass any law authorizing their enforcement, but in the absence of any such prohibition there is no good reason why the State should be powerless to do justice, or to recognize

obligations which are meritorious and honorary and to provide tribunals to pass upon them. The legislative power is sufficient, even as between individuals, to afford new remedies and to create liabilities not before existing, where they are based upon general principles of justice.

"As a general rule money expended or services rendered by one individual for the benefit of another, but without his request or authority, do not create a legal liability on the part of the person benefited to make compensation. But a law which should provide that in every such case, if the party benefited ratifies the acts of the other, and accepts the benefits, he should be liable, would be free from objection, so far, at all events, as it should apply to future transactions. Where the legislature is dealing with the imperfect obligation arising from such a state of facts, it seems to us that it does not transcend its power by passing a law affording a remedy even in respect to past transactions, where the State adopts the acts and is the party to make the compensation, and no rights of individuals, which are protected by the Constitution, are invaded."

In the case at bar the legislature not only allowed the claim but directed the Court of Claims to compute the amount found due under such conditions and award judgment, the language of the act being that the Court of Claims *shall* determine the amount of the difference between the contract and cost price and award judgment. The legislature cannot do indirectly what it cannot do directly. In the case of *Munro* v. *State of New York*, 223 N. Y. 208, where the claimant had been injured while in the employ of the state by reason of the acts of an insane person at a state hospital (although the state was not legally liable) yet it was held that the enabling act was constitutional and

not in violation of the constitutional principles above named. In that case, after reciting the facts, the legislature declared that such facts shall constitute a legal and valid claim against the state and the court *shall award and render judgment for the claimant;* and it was there held, Judge Crane writing the opinion, that the word "shall" was not intended to nullify the power of the court to hear, audit and determine or make it compulsory to award damage (the clear meaning of the intent of the legislature was to confer authority and power upon the Court of Claims and not to direct or control its action). This was the reason, and the court says: "It might appear at first reading as if the legislature had allowed Munro's claim and merely left it to the Court of Claims to fix the amount of damages, but when we read more closely and apply the rules of statutory construction this impression vanishes. 'The spirit, not the letter, must control,' said Miller, J., in *Matter of Jensen* v. *Southern Pacific Co.* (215 N. Y. 514, 522) where 'may be' was held to mean 'shall be.' By the first clause of the act the Court of Claims 'is authorized to hear, audit and determine the claim of John I. Munro.' It is then provided, 'if the court finds such injuries were so sustained, damages therefor shall constitute a legal and valid claim against the state, and the court shall award to and render judgment for the claimant for such sum as shall be just and equitable.' The use of the word 'shall' in these latter phrases was not intended to nullify the power of the court to hear, audit and *determine* or make it compulsory to award damages."

The word "shall" in the enabling act in the *Munro* case was held by Judge Crane to mean "may" for the reason that the word "shall" in that case, as Judge Crane said, did not intend to nullify the power

of the court to hear or to determine or make it compulsory to award damages. " The clear intent of the legislature was to confer authority and power upon the Court of Claims and not to direct or control its action." In the enabling act in the *Munro* case the court was not directed to award judgment, but the statute merely directed the court in that case to render judgment for the claimant for such sum as shall be just and equitable.

The enabling act in that case still left the determination of the questions to the Court of Claims. We think that the act conferring jurisdiction upon this court, chapter 459 of the Laws of 1919, was clearly in violation of the provisions of section 19, article III, and section 28 of article III. It not only audited and allowed a private claim against the state, but gave extra compensation to a contractor in violation of section 28 of article III. " Extra " is defined by Webster — " Beyond or greater than what is due," and this is commonly understood to be the meaning of the word " extra;" and when the Constitution provided there should be no extra compensation it certainly was intended by the framers of the Constitution that no pay beyond that which is named in the contract should be allowed a contractor. Extra compensation was precisely what the legislature did grant the contractor, by virtue of chapter 459 of the Laws of 1919; and while under the decisions if the state was under a moral obligation so to do and it was founded on justice and equity, the legislature could so do, still the legislature by virtue of these amendments of the Constitution had no authority to determine that question itself, but was obligated to confer jurisdiction upon some judicial tribunal, where the equities could be determined. If this act had conferred jurisdiction upon some duly constituted judi-

cial tribunal to *hear, audit and determine* the equities and justice of the claim, we think it would not have been in violation of the provisions of the Constitution of this state, above named; but as the act did not do this but allowed extra compensation to a contractor and only authorized the Court of Claims to hear the claim and then directed the court to award judgment for an amount to be computed, we think was in violation of the provisions of the Constitution. We think that the Knight Act allowed extra compensation to a contractor and merely left it to the Court of Claims to fix the amount, and this amount was to be fixed by ascertaining the difference between the amount named in the contract and the increased cost brought about by conditions created by the World War, so that the act substantially directed the Court of Claims to award judgment. It left nothing for the Court of Claims to do. It did not call upon the Court of Claims to exercise any judicial functions but the legislature assumed to allow extra compensation and through the Court of Claims compel the state treasurer to pay this contractor beyond the amount stipulated in the contract. The act might just as well have directed some person to have computed the amount and upon such computation directed the state treasurer to pay it. This was precisely what the Constitution as amended in 1874 intended to prevent. We must, therefore, conclude that the act is unconstitutional.

Claim dismissed.