## LANG & GROS MFG. CO. v. FT. WAYNE CORRUGATED PAPER CO.

(Circuit Court of Appeals, Seventh Circuit. November 22, 1921.)

No. 2870.

1. **Sales 23(3)—Order for weekly shipments held accepted by conduct.**

Where the parties had exchanged considerable correspondence concerning an order for a large quantity of cloth tape, and as a result thereof defendant finally ordered the shipment of tape by reference to a previous order to be made in weekly shipments, the action of plaintiff in making weekly shipments of substantially the amount ordered was an implied acceptance of the order.

2. **Sales 85(2)—Offer "subject to market conditions remaining unchanged" refers to time of acceptance.**

Where an offer for the sale of tape was made "subject to market conditions remaining unchanged," the term referred to unchanged conditions at the time of the acceptance of the offer, and not to a change of conditions which might occur after the acceptance of the offer and before performance of the contract was completed.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Subject to.]

3. **Sales 85(2)—Inability to purchase supplies to fill order must be shown at date of acceptance.**

A condition in an offer to sell tape that it was subject to ability to purchase the material specified does not relieve the seller of liability, where it accepted an order for the tape after considerable correspondence and began filling the order, but claimed that some time after the acceptance it became unable to purchase the material, and where during its correspondence with the buyer it had urged definite information, so that it might protect itself by advance purchases of raw material.

4. **Sales 172—Impossibility of performance because of war held not shown.**

Where a contract for the sale of tape was made some time after war was declared, and shipments were made from time to time thereafter, and finally terminated after the seller had sought to induce the buyer to order a different quality of tape, the seller cannot excuse his nonperformance on the ground it had been rendered impossible by the war.

5. **Sales 172—Correspondence held not to show final contract was limited to six months.**

Where the original proposition for the purchase of tape referred to the buyer's requirements for six months or a year, but the order as finally made was for a definite quantity of tape to be shipped in specified weekly amounts, which would require 50 weeks for the shipment of the entire amount, it was evident the provision for a 6 months requirement had been eliminated, and the seller cannot excuse nonperformance after the expiration of 6 months because of that provision.

6. **Sales 87(2)—Evidence as to trade meaning or expression held immaterial.**

Evidence offered by the seller that the expression "subject to market prices remaining unchanged" meant under a trade custom that the contract was subject to the seller's ability to purchase the material when

---

For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the specifications were furnished by the buyer and at time of receipt of buyer's shipping orders, was immaterial, where the buyer began making shipments on receipt of the specifications and shipping orders, and the breach did not occur until 6 months thereafter.

**7. Sales ⚖⇒93—Evidence held not to show abandonment by buyer.**

Evidence that, after the seller had breached its contract to furnish the buyer with a stated quantity and quality of cloth tape in weekly shipments, the buyer had purchased a different quality of tape to supply its needs, making such purchases largely from the seller at an increased price, *held* not to show abandonment by the buyer of the contract originally made.

**8. Appeal and error ⚖⇒499 (3)—Objection to testimony and competency of expert must be shown by the record.**

The contention that the trial court erred in admitting the testimony of witness as an expert on market values does not require reversal, where the record shows no objection to his evidence or to his qualification as an expert.

In Error to the District Court of the United States for the District of Indiana.

Action by the Lang & Gros Manufacturing Company against the Ft. Wayne Corrugated Paper Company, in which defendant admitted the claim sued on, but filed a counterclaim. Judgment for plaintiff for only the difference between its claim and the counterclaim, and plaintiff brings error. Affirmed.

The Manufacturing Company, plaintiff in error, sued the Paper Company, defendant in error, for $11,065.47 for merchandise sold. The Paper Company admitted the demand, but counterclaimed $10,415.29 as damages for breach of contract for sale of other material. Counterclaim was disputed, though not as to amount. Court directed allowance of counterclaim and verdict and judgment of $661.04 for Manufacturing Company, which prosecutes this writ. The issue is on the counterclaim.

Manufacturing Company was a producer or finisher of cloth tape, and Paper Company a maker of corrugated paper boxes, for which such tape was required. The alleged contract claimed to have been breached by Manufacturing Company is evidenced by correspondence, in substance as follows:

(a) Letter April 7, 1917, from Paper Company to Manufacturing Company asking proposal on requirements of ungummed tape "on the basis of six months and one year respectively."

(b) Letter April 10, 1917, Manufacturing Company to Paper Company: "Replying, we are pleased to quote you as follows, subject to market conditions remaining unchanged and our being able to purchase the material as you specify." Then follow price quotations. "The above quotations are made with the understanding that goods will be ordered forward in approximately equal monthly shipments. Terms, f. o. b. our mill net thirty days or less, 2 per cent. for cash ten days from date of invoice."

(c) Letter April 28, 1917, Manufacturing Company to Paper Company: "We inclose you herewith order covering the requirements of tape in accordance with your proposal. * * *"

(d) Order referred to on printed blank form of Paper Company, April 28, 1917, No. 6299: "Ship to us at Ft. Wayne, Ind., delivery to be made subject to our further orders, terms 2 per cent. ten days f. o. b. Brooklyn, 5 million yards basis one-inch cambric filled tape ungummed. * * * $3.30 M. yards. 1" wide. One million yards basis one inch wide extra heavy * * * ungummed Hercules cloth $3.60 M., 150 thousand yards basis one inch wide cambric cloth gummed $4 M."

⚖⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

(e) Letter May 1, 1917, Manufacturing Company to Paper Company, acknowledging letter of 28th ult., inclosing order No. 6299: "We regret to state that we cannot at this writing accept your contract, inasmuch as you have failed to specify your acceptance of terms and conditions in accordance with our offer of April 10th. In regard to our quality 16 plain cloth (which is the five million yards ordered), we find that we failed to specify a six-months period but such was our intention. Subject to your immediate response, we are willing to enter your contract for goods to be taken in approximately equal monthly shipments during a period of six months. * * * Offer on the plain Hercules cloth was for immediate shipment."

(f) Telegram May 3, 1917, Paper Company to Manufacturing Company: "Immediate shipment of Hercules cloth will be satisfactory. Wire acceptance to-day if contract prices and specifications will go forward."

(g) Telegram May 3, 1917, Manufacturing Company to Paper Company: "Your telegram received. We will accept contract prices as requested."

(h) Letter May 3, 1917, Paper Company to Manufacturing Company, re order No. 6299: "Acknowledging receipt of to-day's telegram in confirmation of acceptance of order 5,000,000 yards basis 1″ wide ungummed cambric filled tape $3.30 per M.; 1,000,000 yards Hercules to be shipped at once. We should like to have all the time possible in the handling of the regular ungummed cloth, and if possible shipment not to commence before the 1st of October. Wish you would advise us the longest amount of time that could be arranged for in the shipping of regular cloth and we will arrange the specifications accordingly."

(i) Letter May 3, 1917, Manufacturing Company to Paper Company, quoting the telegrams of same date (f and g): "We understand you are forwarding specifications, as, of course, if you intend to change the amount specified in your previous order, we wish you to let us know promptly, so we can protect ourselves by contracting for the correct amount of raw material."

(j) Letter May 8, 1917, Manufacturing Company to Paper Company, acknowledging receipt of letter and telegram of 3d: "We understand you will forward us promptly specifications on the Hercules cloth. In regard to the other matters that you wish us to take under consideration, please to be advised that we will do all we can to meet your views and will write you a little later in regard to same."

(k) Letter May 22, 1917, Manufacturing Company to Paper Company: "With further reference to your letter of May 3d, please to be advised that in the matter of the quality 16 plain cloth tape covered by your contract, we will try and waive the matter of 'shipments until October. We expect, however, that, we shall have to pay a substantial advance for finishing after July 1st, which will, of course, necessitate our ordering goods forward before that time in order to protect ourselves. If we find it necessary to do so, we shall take the liberty of asking you to help us out by taking in some goods before October, but shall do the very best we can to meet your views in the matter."

(l) September 10, 1917, Paper Company to Manufacturing Company, re order No. 7263: "Beginning with October 1, ship 50 thousand yards 2″ ungummed filled tape to apply on contract order No. 6299."

(m) Letter September 14, 1917, Manufacturing Company to Paper Company: "We have before us your letter of the 10th inst., asking us to begin shipments on your contract for plain quality 16 cloth tape, and note that it calls for 50,000 yards 2″ beginning with October 1st, but it does not state how often shipments are to be made. Please inform us promptly in this matter, so we can make provision to take care of you."

(n) Letter September 17, 1917, Paper Company to Manufacturing Company: "In re our order No. 7263: Replying to your letter of the 14th, acknowledging the above order, we intended to state on this order that it was to be a weekly shipping order. In other words, beginning with the 1st of October, we would like to have you ship at the rate of 50,000 yards 2″ ungummed tape per week."

Thereupon began weekly shipments of about 50,000 yards of the 2″ tape (equivalent to 100,000 of the 1″), which continued until January 10, 1918, after which further shipment was for a time discontinued. April 6, 1918, Paper Company wired Manufacturing Company: "Rush quick 100,000 to 200,000 yds.

2″ tape. Through oversight have permitted our stock to run down dangerously close." April 8, 1918, this was followed by a letter to Manufacturing Company, re order No. 7263, reiterating the wired request, stating they did "not understand why shipments were discontinued," and urging prompt action. On the 10th another wire to same effect was sent, and on same date Manufacturing Company wired, "Shipped tape yesterday, also to-day." Under date of April 8, 1918, Manufacturing Company wrote: "We beg to acknowledge receipt of your telegram of the 6th inst., and we will make substantial shipments of quality 16 plain cloth tape on Tuesday, the 9th. Trusting the goods will arrive in time to meet your requirements, we remain." April 11, 1918, Paper Company acknowledged receipt of letter of 8th and wrote: "Please be sure to resume weekly shipment, and for the first two or three weeks ship us 100,000 yards; after that time make the regular weekly shipment of 50,000." April 16, 1918, Manufacturing Company wrote: "Replying, will state that we are not at present accepting any orders for our quality 16 cloth tape same as you have previously had," and referred to sending of a circular in regard to a new process cloth tape, saying that many large companies had adopted it, and expressing belief that it will be generally adopted in the future, advising a trial order, and offering to quote on Paper Company's requirements of such grade as may be selected. Beginning April 9, 1918, the shipments of the contract tape were: April 9, 150,300 yards; April 10, 100,200; April 10, 100,-200; April 11, 51,600. Thereafter none of this tape was shipped. Manufacturing Company was paid for all of this tape that was shipped, its claim being based on other tapes which the Paper Company purchased of it. Tape such as that in question rose rapidly in price in 1918, reaching in August approximately $8.50 per M. yards 1″, and to supply *its requirements Paper Company bought other tapes at about such price, much of it from Manufacturing Company.*

Neil P. Cullom, of New York City, for plaintiff in error.

James M. Barrett, of Ft. Wayne, Ind., for defendant in error.

Before ALSCHULER, EVANS, and PAGE, Circuit Judges.

ALSCHULER, Circuit Judge (after stating the facts as above). To entitle the Paper Company to recover damages for breach to contract, it must appear that there was a contract to deliver 5 million yards of the tape basis one inch in weekly shipments of substantially 50,-000 yards 2″. It is insisted for plaintiff in error: (1) That it never accepted defendant's final order to deliver 50,000 yards weekly beginning October 1; (2) that it was under no obligation to deliver the tape, if the price of raw materials changed, or if it was unable to purchase raw materials when the orders were given, and that war conditions relieved it from responsibility to deliver; (3) that if there was a contract it expired by its own terms October 3, 1917, and in any event on March 3, 1918, and that no deliveries thereafter could have been required; (4) that defendant in error breached any contract there was by failing to make its specifications prior to September 17, 1917; (5) that there was error in the exclusion and admission of evidence, and in the court's direction of verdict.

[1] The proposal which it is claimed was not accepted is that contained in Paper Company's specification of September 10 for shipment of 50,000 yards 2″ tape beginning October 1, followed by the letter of September 17 stating that this was intended to be a weekly shipping order, and again specifying 50,000 yards 2″ tape per week. This last letter followed the Manufacturing Company's inquiry of September

14, which referred to the order, calling attention to the fact that it is not there stated how often shipments are to be made, and requesting prompt action. While the record shows no reply to the letter of September 17, it does show that in pursuance of it the Manufacturing Company at once began shipment of approximately 50,000 yards 2″ tape, and continued practically weekly thereafter for a number of months. This order referred to contract order No. 6299, which specified 5 million yards. There is nothing in the evidence to suggest any quantity other than 5 million yards as the subject-matter of these parties' dealings. It was either 5 million yards or no fixed quantity at all. One cannot read the record of the transaction between the parties without concluding that, as the deliveries were being made and accepted and paid for, it was under the full assumption and belief on the part of both that there existed between them a valid and binding contract for the sale of 5 million yards of the tape at the stipulated price to be delivered and accepted at the rate of 50,000 yards 2″ each week until the entire quantity was delivered. If in any manner the minds of the parties met on this proposition, it is sufficient manifestation of a binding contract, even though formal acceptance is wanting. The contract of a party in making performance in pursuance of a definite proposition is an acceptance of the proposition. Page on Contracts (2d Ed.) § 156; Parsons Contracts (9th Ed.) § 476; Miller v. McManis, 57 Ill. 126; Plumb v. Campbell, 129 Ill. 101, 18 N. E. 790; Monarch Cement Co. v. Creedon, 94 Neb. 185, 142 N. W. 906; Woodbury v. Jones, 44 N. H. 206; N. Y. & N. H. R. R. v. Pixley, 19 Barb. (N. Y.) 428.

[2] As to rise in market prices and inability to purchase materials, we find in Manufacturing Company's letter (b) quoting figures, the words, "Subject to market conditions remaining unchanged and our being able to purchase the material as you specify." If it be assumed that these conditions ultimately remained as part of the contract, we are of opinion that the expression "subject to market conditions remaining unchanged" would have reference to the time the contract was entered into, so that if, at some time after the proposition was made and before acceptance, prices had materially advanced, the Manufacturing Company would not be bound by the subsequent acceptance of the Paper Company, but might then have objected that the price had advanced; but if, without such objection, it accepted the order as finally given, it would be bound by it, even though after ultimate acceptance the price did advance.

[3] As to inability to purchase material, it may be said that the record discloses no evidence, nor was any offered, that at the time the specification was made there was inability to purchase the material. As early as in the letter of May 3, Manufacturing Company stated that it wished to be promptly informed of the specifications, so that it might protect itself for the correct amount of raw material, and when in September, after the specification had been definitely made at 50,000 yards per week, and it manifested, as indicated, its willingness to accept the contract and specifications, it might then, as before, have protected itself by arranging for raw material, or, if unable then

to do so, promptly have made known the circumstances and claimed then the advantage it now seeks, because of suggested inability to procure the raw material, and declined to accept the specification and begin shipments.

[4] As to the suggestion that war conditions prevented compliance, the war was on during practically all the time covered by the correspondence and the negotiations, and there was nothing in the correspondence or otherwise in the record to indicate any intention that the contract should be affected by the exigencies of existing war. After having supplied about half of the total contract requirement for this tape the Manufacturing Company said in the letter of April 16 that they would not at present accept any further orders for such tape, but suggested that they were putting out another tape, which was being used by other manufacturers, and which they claimed eliminated some of the objectionable features of the contract tape. But in this letter they did not suggest the substitution of this tape for the other to fill the contract, but advised the giving of a trial order, and that, if satisfactory, they would be "very pleased to quote on your requirements as soon as we know the grade you have selected." This amounted to a declination to be governed by the contract, and an invitation to enter into a new contract for the new material at some new price to be agreed upon. Indeed, the large quantity of other tapes which Paper Company was compelled to buy, and did buy of Manufacturing Company, was charged at the greatly increased market prices, without regard to the contract.

[5] Respecting the contention that the contract expired by limitation on October 3, 1917, and that in no event did the contract require specifications to be filled after March 31, 1918, it appears that, after the first order was forwarded, the Manufacturing Company on May 1 stated it could not accept it because not in compliance with its offer, though not stating wherein it did not comply. Attention is called in that letter to the fact that the original offer failed to specify a six-months period for the quality 16 tape, and that it was willing to enter the contract for supplying the tape, to be taken in approximately equal monthly shipments during a period of six months. It also called attention to the fact that the offer on Hercules tape was for immediate shipment, and that the price of that had advanced since the offer, quoting new price of $3.95. The Paper Company responded by a telegram wherein it said "immediate shipment of Hercules cloth would be satisfactory. Wire acceptance to-day of contract prices and specifications will go forward." This of itself did not signify a willingness to accept the six-months period as part of the contract; indeed, the only proposition contained in the Manufacturing Company's last named letter, which the Paper Company's telegram and letter of May 3 accepted, was with reference to the immediate shipment of Hercules cloth. This is further manifested by the Paper Company's letter of the same day wherein they acknowledged receipt of the Manufacturing Company's telegram accepting the contract prices as requested, and stating their understanding that the contract was for 5 million yards of the one inch ungummed tape at $3.30 per M. and one million of the Hercules at $3.60

per M., which was the price named in the Manufacturing Company's original proposal for the Hercules tape, and the Paper Company's order therefor, and not the advanced price stated in the Manufacturing Company's letter of May 1. That the May 3d letter of the Paper Company was satisfactory to the Manufacturing Company is manifested by its reply to it of May 8. That there was no six months limit, as was proposed in the Manufacturing Company's letter of May 1, is evident further from what is said in the Paper Company's May 3d letter, wherein it asks that the time for shipment of the tape in question do not begin until October 1, and postponing the statement of requirements until the Manufacturing Company replied to this request, which the latter did through its letter of May 22, in further reply to that of May 3, stating that it would try to waive matter of shipments until October. The matter of deliveries appeared to have remained in suspense for nearly four months, until, under date of September 10, the Paper Company sent its order to apply on its previous contract order, for shipment beginning October 1 of 50,000 yards 2″ tape, followed by that of September 14th fixing weekly intervals for shipments, as pointed out.

Assuming, as we do, that the contract quantity of this tape was 5 million yards 1″, it is very plain that if the deliveries were made weekly of 50,000 yards 2″, it would require 50 weeks to complete delivery. Given the total yardage and the quantity to be delivered weekly, it would be quite superfluous to insert in the contract the time within which delivery was to be completed. It is there as definitely as if it had been specified. That practically such a time was under consideration, though not in words carried into the contract, would be indicated by the Paper Company's very first request for submission of prices, wherein it asked it on basis of six months and one year, respectively. Six months was evidently dropped out, and a period of nearly one year by necessary inference inserted. The contention that defendant in error breached the contract by failing to make its specifications earlier than September 17 is negatived by what has been said respecting the specification for deliveries, and acceptance by the Manufacturing Company.

[6] As to the alleged errors in rejecting evidence for plaintiff in error, the first is the offer to prove a trade custom that the expression "subject to market prices remaining unchanged and our being able to purchase the material as you specify" means that the contract was to be subject to the seller's ability to purchase the material when the specifications were furnished by buyer and subject to conditions remaining unchanged at time of receipt of buyer's shipping orders. While we have heretofore stated our view of what the expression means, uninfluenced by any trade usage, yet, admitting in general the propriety of evidence as indicated by the offer, there is nothing in the offer which makes it material. The offer refers to the time the specifications were furnished, which was on September 17, and no claim was then made by the seller that there had been any change in market price of the tape, or that there was then inability to purchase the material; but, as has been pointed out, the specifications were accepted,

and the contract, as it then was, both parties proceeded to execute, and they actually and strictly operated under it for a considerable time. Under these circumstances the offered evidence was properly excluded.

[7] Second, certain letters and telegrams between the parties were offered for the purpose of showing conditions which rendered impossible the delivery of the tape in question, and that defendant in error voluntarily abandoned the contract and purchased a large amount of other material in place of this tape. We have commented on this situation, and we find nothing in the rejected correspondence which would in our judgment relieve plaintiff in error from the consequence of its failing to fulfill its contract. We find nothing in the offered evidence that tends to show abandonment of the contract by defendant in error. It purchased a large quantity of tape in the open market, most, if not all, from plaintiff in error. It paid the very much greatly increased market price for this substitute material. Plaintiff in error did not contend that it was thereby complying with the contract; indeed, it contends that in 1919, after prices for the contract tape had very materially declined, it offered the Paper Company to deliver the balance due on the contract. We find no error in the rejection of the correspondence.

[8] As to the contention that the court erred in admitting the testimony of witness Stalhut as an expert on market values of such tape, it is sufficient to point out that the record shows no objection to his evidence or to his qualification as an expert.

We find no error in the record, and the judgment is affirmed.