MAXWELL et al. v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. January 13, 1925.)

No. 2268.

1. Judges ☞7—Retired federal judge still in service and authorized to act without designation.

Under Judicial Code, § 260, as amended by Act Feb. 25, 1919 (Comp. St. Ann. Supp. 1919, § 1237), providing that a Circuit or District Judge retiring voluntarily "shall be held and treated as if junior in commission to the remaining judges of said court," a retired District Judge is still in the service and may hold court in his district without designation.

2. United States ☞73—Contractor for post office building held not relieved from liability for nonperformance by war activities of the government.

A contractor who, after the United States had entered the war, contracted to build a post office, to be completed within a stated time, which was made of the essence of the contract,

*held* not relieved from liability thereunder for failure to complete it within the time by the war activities of the government, including conscription of men for the army, the employment of a large number of men at high wages in the building of a large camp near by, and the taking control of transportation, all of which made it difficult or impossible for the contractor to obtain labor and material at prices warranted by his contract.

### 3. United States ⬤⇒73 — Government acts which would not relieve contractor with private party from liability for breach of contract will not relieve government contractor.

While it is settled law that the United States as a party to commercial or business contracts is subject to the same rules that govern private parties, and that a party to a contract cannot recover damages for its breach when by his own acts he frustrated performance by the other party, where legislative or administrative measures of general character, taken under authority of law, would not change the rights of one who had contracted to do something for a private individual, they will not be any more effective because the undertaking was with the government.

### 4. United States ⬤⇒73—Termination of building contract by government held justified.

The government *held* justified in terminating a contract for building a post office and in completing the work at the contractor's expense, when nearly a year had elapsed since the time fixed by the contract for completing the building and where, to a notice that the contract would be terminated unless satisfactory arrangement was made within eight days for effectively carrying on the work, neither the contractor nor his surety made any response.

In Error to the District Court of the United States for the Eastern District of South Carolina, at Charleston; Henry A. Middleton Smith, Judge.

Action at law by the United States against William H. Maxwell and the Globe Indemnity Company. Judgment for plaintiff, and defendants bring error. Affirmed.

See, also, 299 Fed. 613.

Christie Benet, of Columbia, S. C., and George A. King, of Washington, D. C. (King & King, of Washington, D. C., Benet, Shand & McGowan, of Columbia, S. C., F. A. W. Ireland, of New York City, Frank G. Tompkins, of Columbia, S. C., and Charles F. Harley, of Baltimore, Md., on the briefs), for plaintiffs in error.

J. D. E. Meyer, U. S. Atty., and Louis M. Shimel, Asst. U. S. Atty., both of Charleston, S. C.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

ROSE, Circuit Judge. The plaintiffs in error, William H. Maxwell and the Globe

Indemnity Company, hereinafter referred to as the contractor and the surety, respectively, were defendants below. The plaintiff there was the United States, herein styled the government. It sued them on the bond they had given for the performance by the contractor of his undertaking to build the post office at Columbia, S. C.

[1] The surety says that the late Judge Smith, before whom the case was tried below, had not been properly designated to hold the District Court of the United States for the Eastern District of South Carolina and what was there done was a nullity. At the time, Judge Smith was a retired District Judge of that district, having the status defined and regulated by section 260 of the Judicial Code as amended by the Act of February 25, 1919, 40 Stat. 1157 (Comp. St. Ann. Supp. 1919, § 1237). The surety's contention is that a special authorization is required before such a judge can discharge any judicial function. If he is to act in the judicial circuit to which he formerly belonged, that authorization must come from its Senior Circuit Judge. If what he is to do is to be done outside of that circuit, the authority may be given by either the Chief Justice of the United States or by presiding or senior judge of the court in which he is to sit. It is admitted that the Senior Circuit Judge of this circuit did not designate Judge Smith to hold a District Court in the Eastern District of South Carolina. The short answer to all this is that Judge Smith, under his original commission, was entitled to hold the court of that district and required no designation from any one to do so. He was still a District Judge of that district, as the act itself clearly recognizes by directing, "The judge so retiring voluntarily * * * shall be held and treated as if junior in commission to the remaining judges of said court." Such is the construction which the act has universally received in practice in this circuit and so far as we know, in all the others. Moreover, it may be said, in passing, it was the one given to it in the congressional debate which preceded its enactment. Mr. Steele, who spoke for the committee which reported it to the House, said: "The merit of this provision is that instead of resigning, the judge simply retires and is still enabled to perform such judicial service as he is capable of performing when the business of the district demands it. The district receives the benefit of such service without any additional expense to the government." Con-

gressional Record, 65th Congress, Third Session, 368. During the course of the debate, Mr. Dyer said: "If this bill becomes a law, it will still permit the other judge, that is the judge who is being given this assistance, but who still remains on the bench, to be a judge in fact, not a supernumerary, and if any one appeared before him for a writ of any kind, he would have full authority to issue that writ. In other words, the new judge would not be the only judge of the court." Id., 370.

Of the dozen errors assigned, some refer to the refusal of the court to direct a verdict for the defendants, others to the direction of a verdict for the plaintiff, and the remainder to the exclusion of testimony which the defendants sought to introduce. The bond sued on was executed and delivered on the 1st of August, 1917, and the contract, the due performance of which it was intended to secure, bore date on the previous day. The contractor bound himself to complete the work within 20 months; that is to say, by the 31st of March, 1919. Time was declared to be of the essence of the undertaking, and the contractor was to pay $10 per day as liquidated damages for each and every day's delay not caused by the government. The Secretary of the Treasury might waive such damages in whole or in part, and the contractor was to be entitled to one day in addition to the stipulated time for each day the work might be suspended by the government and to a similar extension for each day's delay caused by the government provided written claim for such extension was made within 10 days of the occurrence of such delay. There is nothing in the record to show that the contractor ever made any such claim. The contract further provided that if the contractor should fail to prosecute the work with such diligence as in the judgment of the government would insure its completion within the time provided, the government might after eight days' written notice to him, and his failure within that time to take such action as would in the government's judgment remedy the fault for which the notice was given, take possession of the work and of the tools and materials on the site and complete the undertaking at his expense.

On the 22d of March, 1920, 11 months and 20 days after the contract time for completion, the government gave the contractor written notice, a copy of which it also caused to be delivered to the surety, that from the reports on file with it his dilatory and unsatisfactory manner of conducting the work had caused, and was causing, unwarrantable delays, resulting in loss and damage to the United States. The notice warned him that unless within eight days from its service he should satisfy the Department he had taken such steps and made such arrangements as would absolutely insure the full and satisfactory completion of all the work embraced in the contract without any further delay on his part, the Department, acting for the government under the contract, would terminate his right to proceed under it and would take possession of the work, machinery, tools and materials on the site belonging to him and would complete the work at his expense and that of his surety. Neither the contractor nor the surety, did, said, or wrote anything in consequence of the notice, and on the 31st of March the government notified both of them that the conditions were very unsatisfactory and that the contractor's right to proceed under the contract was terminated. Each of them received this notice in a silence which upon the part of the contractor was never broken, so far as the record discloses, until after this suit was brought some 16 months later. At first, the surety apparently was quite as reluctant to commit itself to anything. More than 3 months of repeated letters and telegrams from the government representing the urgency of the situation and the need for immediate action elicited nothing more definite from it than the statement that it would look into the matter. It was not until July 17th that it finally notified the government that it would not complete the contract. The government thereupon invited and received competitive bids from other parties for finishing the building and awarded a contract to do so to one of them. This suit was brought to recover the amount for which the total cost to the government of the post office exceeded the sum for which the contractor had undertaken to erect it. There is no controversy that this excess amounted to $110,323.55, for which the government is entitled to a judgment if it is entitled to recover anything as defendants say it is not.

By cross-examination of witnesses offered by the government and by direct testimony of those produced by the defendants, the latter sought to show that the government itself had prevented the contractor from obtaining the labor and materials needed for the work. Much of this testimony was altogether excluded by the court, and the effect of granting the government's prayer for a

directed verdict in its favor was to hold that such of it as had come in did not raise any material issue of fact upon which the defendants were entitled to have the jury pass.

[2] It will tend to clearness if consideration be first given to so much of the testimony, the admissibility and materiality of which is in dispute, as in the judgment of the defendants tends to show the government prevented the contractor from getting the labor he required. The gravemen of their complaint on this score is that the government by pressing the construction of the enormous works at Camp Jackson as well as at other sites near enough to Columbia to affect its labor market, and by the wages it paid or authorized its cost-plus contractors to pay, made it impossible, in a commercial sense, for the contractor to get or to keep sufficient men on his job. He offered to show what the mechanics and laborers employed in the government service received, that they were allowed to work for more hours than the eight to which by law and his contract, his employees were restricted, and that for overtime, that is, for the time in excess of eight hours, the men directly or indirectly in government employ were paid at the rate of time and half, while for their work on Sundays and holidays they received a double wage. He tendered testimony that other inducements, such as free rides to and from their places of employment, were offered to laborers by the government or by contractors whose labor bills it paid. He sought to show that the government not only inserted advertisements in South Carolina papers for laborers of many or all kinds, and offered them the high wages and attractive working conditions already referred to, but put the like advertisements on handbills which it caused to be distributed in the immediate vicinity of the work on which he was engaged, and that it went so far as to post those offers on a bulletin board on the post office site itself. Many, if not all, of these advertisements, suggested or urged that it was a patriotic duty to do all one could to get the camps ready on time. Some, but apparently not many, of the men employed by the contractor were drafted into the military service. He was asked whether any others were taken from the work by the government. The question was objected to and the objection sustained, but as no offer of proof was made we do not know what the answer would have been, and therefore we are not justified in holding that substantial harm was done by the ruling.

The defendants' claim that the contractor was prevented by the government's action from obtaining materials relates principally, although not exclusively, to the effect of government embargoes and priority orders as affecting the transportation of coal. The contractor had agreed to get the needed bricks from a brickmaker in the vicinity of Columbia. At some of the times at which the contractor wanted the bricks and could have used them to advantage, he could not get them because the brickmaker had none in stock and he was not able to burn any because he could not get any coal, all the coal, or perhaps, more accurately, all the railroad facilities for moving coal, being then required to supply fuel for needs more pressing than for making bricks. The contractor told the government officials with whom he was in contact of his difficulty and sought their aid. They apparently did what they could to help him, but their efforts were at best only tardily and partially successful. There is a good deal of conflict in the testimony as to how much delay in putting up the post office was the result of the brickmaker's failure to get coal promptly, but there was testimony which might have justified a jury in finding, if it chose, that some did.

In passing upon the rulings below, the government reminds us that on June 30, 1917, when the contractor made his bid, and on July 31 of the same year, when he executed his contract, this country had been for some months at war with Germany. The first selective draft act had been passed 6 weeks before the contractor sought the contract and more than 10 weeks before he entered into it. Nevertheless, he was then asked to build the post office in 20 months. He said he would, and the surety guaranteed that he would keep his word. He understood it was a war-time job, and yet he agreed that time was of the essence of the contract, although, before he did so, he knew that we had adopted the policy of raising our armies by conscription. In June and July, 1917, every one was aware that the war in which we were participants was the most gigantic struggle under which this battle-scarred world had ever groaned, and that the experience of every country which had then for years been a party to it had demonstrated that to wage it effectively required the subordination, to a degree never before known, of every other economic and industrial consideration.

Most of the camps and other war con-

veniences mentioned in defendants' offers of testimony had been planned, and work had actually begun on Camp Jackson as well as upon numberless others, before the delivery of the bond sued on. All this is admittedly true, but nevertheless defendants answer that in July, 1917, neither they, nor any one else, foresaw what the next 15½ months had in store, or how completely the necessity of winning the war would dwarf everything else into nothingness. They ask: Is it fair to call upon them to pay so great a price because in midsummer of 1917 their prophetic vision was no keener than that of their fellows. They do not complain that during those months victory became the chief end of the government which ruthlessly ignored all else. They agreed that any other course would have been folly, but they say it is not just that the government shall collect damages from them because they did not do what it made it impossible in any reasonable business sense for them to do. The appeal is not without moving force, but after all is said, are the defendants in any worse luck than were countless others who undertook in war times to furnish things wanted by persons in private station?

[3] Their learned counsel forcibly argued that there has been a great extension of the doctrine of frustration of contract, and that the modern tendency is to make it applicable whenever there has been such a change of conditions as it is not reasonable to suppose could have been in the contemplation of either of the parties when their minds met. It may well be that the defendants are right in their claim that the law on this subject is even now in the making. If so, there is all the more reason why a court should be careful to say no more than is necessary for the decision of the case before it. What defendants sought to show the government did would not have released them from the obligation of their bond had it been given to any other than the United States. As to this the recent well-considered cases are as clear as are those of earlier date. Carnegie Steel Co. v. United States, 240 U. S. 156, 36 S. Ct. 342, 60 L. Ed. 576; Day v. United States, 245 U. S. 159, 38 S. Ct. 57, 62 L. Ed. 219; Columbus Railway & Power Co. v. Columbus, 249 U. S. 399, 39 S. Ct. 349, 63 L. Ed. 669; Lang & Gros Manufacturing Co. v. Fort Wayne Paper Co. (C. C. A.) 278 F. 483; Luckenbach S. S. Co. v. W. R. Grace & Co. (C. C. A.) 267 F. 676; Brevard Tan-

nin Co. v. J. T. Mosser Co. (C. C. A.) 288 F. 725; Harley Hardware Co. v. Lafond Co., 28 Ga. App. 584, 112 S. E. 394; Standard Scale Co. v. Baltimore Enameling Co., 136 Md. 278, 110 A. 486, 9 A. L. R. 1502.

The defendants contend, however, that the rule is different when the government is the obligee of the bond in suit. In their view, it may not hold them liable for not doing what it kept them from doing or the doing of which it made, to a material degree, more difficult or expensive. They say that this would be so even where the obstacles put in their way were the indirect result of legislative or administrative measures in no sense specially aimed at them or at the work upon which they were engaged, but were of a general character applicable to every one doing work or supplying labor or material, whether to the government or to private individuals. They cite many decisions in which it is laid down in somewhat varying phraseology that when the United States appears as a suitor, it voluntarily submits itself to the law, places itself upon the same footing as other litigants, and is not entitled to remedies which cannot be granted to other individuals. Shooter's Island S. Co. v. Standard Shipbuilding Co. (C. C. A.) 293 F. 706. In the case mentioned, the government had made advances to a shipbuilding corporation and had taken what it claimed to be a mortgage on some of its debtor's personal property. This instrument was neither executed nor recorded in the manner required by the state law if it was as a chattel mortgage, to be good against those who had no actual notice of it.

The language relied on by the defendants is used in explaining why the United States could not claim under the defective paper anything which the state statute denied to a private mortgagee.

What was there ruled had been decided many times before. Whether the United States has a lien, and how in the absence of special statutory enactments such lien as it may have ranks among others, is to be determined by the same principles as those to be applied if a private individual stood in its shoes. Brent v. Bank of Washington, 10 Pet. 596, 9 L. Ed. 547; United States v. Ingate (C. C.) 48 F. 251.

If the United States becomes a party to a negotiable instrument, its rights are the same as are those of private persons in like case. United States v. Barker, 12 Wheat.

559, 6 L. Ed. 728; United States v. National Exchange Bank, 1 F.(2d) 888, decided by this court September 29, last. .

The ordinary rules for the interpretation of contracts apply to those to which the government is a party. Hollerbach v. United States, 233 U. S. 165, 34 S. Ct. 553, 58 L. Ed. 898; United States v. Bentley & Sons Co. (D. C.) 293 F. 229.

The form and sufficiency of pleadings do not depend upon whether the government is or is not a party to the litigation. United States v. George A. Fuller Co. (D. C.) 296 F. 178; Lynch v. Ponca City Land & Improvement Co., 13 Okl. 142, 73 P. 1095.

The United States is as much bound as is any one else to return money or property of which it has obtained possession through the fraud of its agent. United States v. State Bank, 96 U. S. 30, 24 L. Ed. 647. Under any of the circumstances mentioned, and doubtless in many others, the government, when it becomes a party to an expressed and sometimes to an implied contract, is bound by the same rules of law as are applicable to private individuals.

The learned and industrious counsel for the defendants have not referred us to a case, nor has our own research discovered any, in which it has been held that where legislative or administrative measures of general character, taken under authority of law, will not change the rights of one who has contracted to do something for a private individual, they will be any more effective because the undertaking has been with the government.

Much reliance is placed by defendants upon United States v. Peck, 102 U. S. 64, 26 L. Ed. 46. In that case Peck had bargained with the government to furnish hay to what was at the time a remote and inaccessible post in the Yellowstone country. Both sides knew that there was only one possible place from which the hay could come. Before the time for performance on Peck's part had expired, the military officers at the post became fearful that he would not do what he had undertaken, and they had other people cut the very hay which everybody knew he must cut if he cut any. They paid those who did the work more than under his contract he would have received. The government attempted to collect the excess from him. Naturally, it was held that the action of the agents of the United States had released him from his bargain. That case is not in point, although it would have been had the government in that before us taken possession of the post office site while the contractor was still diligently prosecuting work on the building and before the contract time for its completion had arrived. Under such circumstances, the government would have had no claim against him even if some compelling military exigency had necessitated its occupation of the premises.

That was not what here happened. The government had much other work to do in Columbia and its vicinity, and to get the labor it needed it offered wages much higher than had ever before been paid in that part of the country or perhaps in any other. There was no intent to interfere with the contractor any more than there was with any one else who had present need of hands, and, if it be material, no offer of proof that he was in fact any more interfered with than were numberless others.

The government in the exercise of its war powers, did what it could to put to the best possible use all available coal as well as the means for moving it. To this end it found it necessary to interfere with the ordinary freedom of trade and transportation. It issued priority orders and thereby kept the contractor's brickmaker from getting sufficient coal to burn the bricks he otherwise would have made. In consequence, the contractor was put not only to annoying inconvenience but to serious loss as well. There were hundreds of thousands of others to whom the same or similar orders brought like hardships. It is certain that they have no legal claim upon the government. In this respect, he is no better off merely because his contract was with it and theirs with private citizens.

So far as our research and reflection go, the rule is accurately stated in 39 Cyc. 743, where it is said: "Contracts with the government, like other contracts, must be performed according to their tenor, both by the contractor and the United States and in general the same acts or omissions which would constitute a breach of contract by an individual, constitute a breach when done or omitted by the government; but the government as a contractor, cannot be held liable for the public acts of the government as a sovereign and whatever acts the government may do as long as they may be public and general, cannot be deemed specially to violate the particular contracts into which it enters with individuals." It is true that there are not many decisions precisely on the point, perhaps because few have ever supposed that the law could be otherwise. The doctrine has, however, been clearly

stated and more than once applied by the Court of Claims. Deming v. United States, 1 Ct. Cl. 190; Jones and Brown v. United States, 1 Ct. Cl. 383; Wilson v. United States, 11 Ct. Cl. 513.

A new tariff act may add not a little to the cost of something which before its enactment a contractor had agreed to furnish the government. He can neither treat the contract as terminated by the passage of the law nor claim extra compensation for carrying out his bargain. It would be easy to multiply illustrations of the distinction between those acts of sovereignty of general application for which the government is not answerable to any one, even although he stands in contractual relation to it and those things by the doing or omission of which it makes itself liable to him. It may be sometimes hard to draw accurately the line between acts which do and those which do not affect the rights of the parties, but there is no such difficulty in the instant case.

The learned court below did not err in excluding the evidence offered nor in treating as immaterial so much of that admitted as tended to show that the general statutes and the administrative regulations of the United States adopted and enforced as war measures delayed the contractor in his work and made its doing more costly to him. Indeed, it is not clear under the facts in the instant case that the defendants would have been any better off were the law as they say it should be. Even if what the government did would have justified them in treating the contract as at an end, they would not have been bound to do so, and in fact they chose to regard it as still in force.

In February, 1918, when according to their own account, their difficulties were at or approaching their height, the contractor with the consent of the surety asked for and obtained payments for materials to which by the terms of the contract he was not entitled, and again 22 months later at the end of December, 1919, 13 months after the Armistice, a somewhat similar favor was, at the instance of the defendants, granted the contractor. On each of these occasions both the defendants in writing agreed that the contract should remain in force in all other respects. That contract gave direction as to what the contractor should do if he thought the government was delaying the work, but it does not appear that he ever made the application for the extension therein provided for. He does not, however, seem to have lost anything by his failure to do so, for the government has not sought, because of his delay, to recover from him any damages liquidated or unliquidated. All that it asks from him is the excess which the post office cost it over the contract price.

[4] There is but a single question in the case: Had the government the right to take the work out of his hands and have it finished at his expense? As early as June, 1918, the government complained to him of the slow progress he was making, calling attention to the inadequacy of his plant as well as to the lack of sufficient workmen. In September of the same year, when it asked him what material he would need in the next four months, he replied that owing to the scarcity of common labor during cotton picking he would, during the next two months, require almost none. In another contemporary letter, he said it was impossible to secure any material amount of common labor, "mostly on account of the cotton gathering and partly on account of the great amount of new cantonment work now being done here by the War Department." A few days later, he reported that on account of cotton gathering he could get no labor. On December 12 of the same year, the government complained to him that there had been no progress made during November. He replied that for six months in 1917 and 1918, progress had been prohibited by inability to get bricks resulting from the coal regulations of the government, and that work had necessarily been suspended in the latter part of October, 1918, to January 2, 1919. He does not explain why, but apparently, as the earlier letter stated, it was because all available labor was employed in picking cotton for private employers. On September 5, 1918, the government wrote him that conditions were not satisfactory and that it would not allow them to continue. He thereupon promised to put on more laborers and said he believed he would complete the job by April 1. On the 14th of October, 1918, 11 months after the Armistice, the government told him that while he had lately been making better progress, the conditions were not yet satisfactory. It said that more men were needed. By this time the government's war activities had long since ceased, even if the inflation of prices and the disorganization of industry had not. On March 10, 1920, when it had become evident that the work would not be completed by April 1, the government asked the surety to send a representative to confer with the supervising architect as to the situation of this contract. The surety appears to have com-

plied with the request, but the record does not disclose what took place at the interview.

On March 21, the notice to the contractor to show cause in eight days why the contract should not be taken from him and the work finished by others was written. Two days later, it was served upon him and his surety. There is in all this no indication of the arbitrariness that sometimes attends the dealing of officials with private contractors. The contention of the defendants nevertheless is that the government not having insisted that the contractor should finish the work within the originally stipulated time of 20 months, the contractor was entitled to a reasonable time thereafter to complete it, and that what was a reasonable time was a question for the jury. We do not find it necessary to review the authorities relied upon by the learned counsel for the defendants, because in view of what confessedly happened, we do not see that they are in point. The notice given the defendants on March 22 did not purport to end the contract. It merely gave them 8 days in which to show cause why it should not be ended. Within that time they did not assign or attempt to assign any reason why this suggested action should not be taken. They admit that the notice was received, and they did not claim that the time, which was that specified in the contract, was too short. Under all the circumstances, the government was justified in acting upon the assumption that they did not question the reasonableness of what it told them it was about to do. As already stated, it does not appear that the contractor ever said anything at all until this suit was brought upwards of a year afterwards, and it was more than 3 months before the surety could be gotten definitely to state that it would not complete the work as the government was anxious that it should.

It follows that the rulings of the court below were right, and its judgment must be and is affirmed.