# COLUMBUS RAILWAY, POWER & LIGHT COMPANY *v.* CITY OF COLUMBUS, OHIO, ET AL.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF OHIO.

No. 715. Argued January 10, 1919.—Decided April 14, 1919.

Constitutional questions not devoid of merit suffice as a basis for jurisdiction in the District Court, however they may be decided. P. 406.

Ordinances passed by the City of Columbus under authority of certain laws of Ohio and accepted by street railway companies, *held* contracts, binding the grantees to furnish street railway service for twenty-five years, at specified rates, in return for the use of the streets, and not permissive franchises which the grantees might surrender when they ceased to be remunerative. P. 407.

If a party charge himself with an obligation possible to be performed, he

must abide by it unless performance becomes impossible through the act of God, the law, or the other party. P. 412.

An unexpected hardship may be considered in determining the scope of a contract obligation, provided the contract is doubtful and requires construction. P. 410.

Where a street car company was under a clear contract obligation to furnish service at specified rates of fare, and various effects of the war, particularly an award of the War Labor Board raising the wages of employees, wrought a serious and unforeseen change of conditions, making the rates grossly inadequate, but it did not appear that performance was thus rendered impossible or that the contract as a whole, for its term of twenty-five years, would prove unremunerative, *held*, that there was no *vis major*, excusing further performance, and that enforcement of the agreed rates would not deprive the company of property without due process of law. P. 413.

Equity cannot relieve from bad bargains simply because they are such. P. 414.

253 Fed. Rep. 499, affirmed.

THE case is stated in the opinion.

*Mr. Joseph S. Clark*, with whom *Mr. Karl E. Burr, Mr. Henry A. McCarthy, Mr. Henry J. Booth* and *Mr. W. O. Henderson* were on the briefs, for appellant.

The franchise ordinances granted permission to operate street cars on the streets of the City upon the terms and conditions therein prescribed, and the Company was bound to comply with these terms and conditions so long as it continued to exercise the franchises, but these grants were permissive only, and have been surrendered and abandoned by the Company. Its reasons for such surrender and abandonment were that the rates of fare prescribed in the grants were no longer compensatory, but, on the contrary, had become confiscatory.

The situation that has been brought about by the War, resulting in a most unexpected increase in operating expenses of all kinds, and particularly the compulsory annual wage increase of $560,000, due to the award of the National War Labor Board, cannot be held to have been within the

contemplation of the parties when the franchises were granted and accepted, and under these circumstances the Company is entitled to a release of the obligations, if any, that these grants may have imposed upon it to continue to operate under them. *The Kronprinzessin Cecilie,* 244 U. S. 12; *Metropolitan Water Board* v. *Dick, Kerr & Co.,* [1918] App. Cas. 119; *Baily* v. *De Crespigny,* L. R. 4 Q. B. 185; *Liston* v. *Steamship Carpathian,* [1915] 2 K. B. (E. & J.) 42; *Tamplin S. S. Co.* v. *Anglo-Mexican Co.,* [1916] 2 App. Cas. 397, 407; *Brenner* v. *Consumers Metal Co.,* 41 Ont. L. R. 534; *Krell* v. *Henry,* [1903] 2 K. B. 740, 749; *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Hoyt,* 149 U. S. 1; *The Styria,* 186 U. S. 1; *B. E. & C. R. Co.* v. *N. Y., L. E. & W. Co.,* 123 N. Y. 316; *Moore & Tierney, Inc.,* v. *Roxford Knitting Co.,* 250 Fed. Rep. 278.

The Fourteenth Amendment is a complete protection against the enforcement of the confiscatory rates prescribed by the legislative enactments represented by these two franchise grants.

*Mr. Henry L. Scarlett,* with whom *Mr. David F. Pugh* was on the brief, for appellees.

MR. JUSTICE DAY delivered the opinion of the court.

The Columbus Railway, Power & Light Company filed its complaint and amended bill of complaint in the District Court of the United States for the Southern District of Ohio against the City of Columbus, Ohio, and officials and members of the City Council of the City, asking an injunction against the enforcement of ordinances concerning the operation of street railways upon certain streets in the City of Columbus. Upon motions to dismiss, and for a temporary injunction, the District Court held that there was no jurisdiction as the amended bill of complaint presented no substantial federal question, and,

considering the case upon its merits, held that the amended bill did not state facts constituting a valid cause of action in equity against the defendant, and dismissed the same. An appeal was prosecuted to this court; the case has been argued and submitted.

The amended bill of complaint alleges in substance that the Company and its predecessors have since the enactment of two ordinances, hereinafter mentioned, and until the 20th of August, 1918, operated a system of street railway lines in the City of Columbus. The two ordinances in question are referred to in the bill and attached thereto. The one, denominated the Blanket Franchise Ordinance, was passed February 4, 1901, and the other, called the Central Market Franchise Ordinance, was passed January 21, 1901. The allegations as to these two ordinances are supplemented by a statement of certain so-called perpetual franchise ordinances on certain streets. The two ordinances, above referred to, are each for the term of twenty-five years. The ordinances were duly accepted by the grantees thereof. Under the provisions of the Blanket Franchise Ordinance the grantee and its successors are required to issue and sell eight tickets for twenty-five cents, and give universal free transfers. The issue and sale of such tickets continued until August 20, 1918, when, it is alleged, the franchise under that ordinance was surrendered and canceled by the Railway Company. Under the Central Market Franchise Ordinance the Company issued and sold eight tickets for twenty-five cents, and gave universal transfers, and continued so to do until August 20, 1918, when, it is alleged, the franchise was surrendered and canceled by the Company.

The bill sets forth allegations as to the extent of the business of the Company—that its railway system includes more than one hundred and ten miles of main track, and supplies the only street railway service in the

City of Columbus, except a very limited service furnished
by interurban cars running at long intervals upon certain
streets, that the Company also supplies power for war
and industrial purposes, and is the only commercial com-
pany furnishing electricity in the City of Columbus.
That Columbus and its suburbs contain a population of
more than 250,000 persons, and constitute a large indus-
trial, manufacturing, military, and railroad center.  That
more than 25,000 persons are employed in the manufac-
ture of munitions, clothing and a great variety of other
war materials for use directly by the United States Gov-
ernment, and for the use of others furnishing war supplies
to the Government; also large railroad shops in which
are employed many thousands of persons engaged in the
making and repair of railroad engines, cars, and other
equipment used and to be used by the United States
Railroad Administration.  That a large majority of the
employees of these shops do and must depend upon the
street railway service of the Company as their means
of transportation to and from their places of employment;
and in said area is located the Columbus Barracks in
which are quartered more than one hundred thousand
recruits per annum, who also are dependent upon said
railway service.  That the discontinuance or impairment
of the plaintiff's street railway service would cause ir-
reparable harm to the Government of the United States,
to the City of Columbus and to all persons dependent
upon the service.  That the Company has more than
twelve million dollars invested in the street railway lines
and equipment.  It has large amounts of outstanding
mortgage bonds, of which the sum of $7,295,000 is charge-
able against its street railway property, the annual interest
charged being more than $333,000.  The operation and
management of the Company show increased and increas-
ing costs of operation and decreased and decreasing net
revenue as a result of the War in which the United States

was then engaged. The bill charges increases in the cost
of coal and in wages paid to the employees. The net
earnings of the operations of the lines for the twelve
months ending June 30, 1918, after deducting operating
expenses, taxes and a proper charge for depreciation were
$301,987, an amount insufficient by more than $31,000
to pay the interest on the outstanding bonds of the
Company, properly chargeable to the railroad property,
and barely enough to pay $2\frac{1}{2}\%$ on the value of the prop-
erty employed by the Company in furnishing street rail-
way service to Columbus. That in June, 1918, the street
railway employees of the Company demanded an increase
in wages, and inaugurated a strike, which resulted in the
discontinuance of the service of the Company for two
days. That the controversy was referred to the National
War Labor Board, which Board on July 31, 1918, rendered
its decision increasing the wages of the street railway
employees more than $50\%$, thereby increasing the oper-
ating expenses of the street railway line by about $560,000
per year. It is averred that as a result of such operation
for the current year ending June 30, 1919, the gross earn-
ings will fall short of paying expenses, depreciation, and
taxes by approximately $250,000, and that there will
be no earnings from which to pay its interest charges,
or to yield any return to the Company on the value of
its property. That on August 20, 1918, the Company
surrendered and canceled its Blanket Franchise and its
Center Market Franchise by notification in writing,
addressed to the City of Columbus, the Mayor, Coun-
cil and Clerk thereof. The Company charges that the
rates of fare prescribed by the terms and conditions of the
two ordinances were not either before or when said fran-
chises were surrendered as above stated, and would not
be if longer enforced against the Company, sufficient to
enable it to maintain its street railway property in good
order and repair and to perform its duty as a public

utility; that the further operation of the street railway lines in the City of Columbus under the two ordinances would be not only impracticable but impossible, and that the enforcement of the said rates of fare would violate the Fourteenth Amendment to the Constitution of the United States. That said rates of fare are inadequate and confiscatory, and their enforcement will deprive the Company of its property without due process of law. The Company charges that the defendents, unless enjoined, will attempt to force it to continue to operate its street railway lines under the said Blanket and Center Market Franchises in violation of rights secured to it by the Fourteenth Amendment to the Constitution. The amended bill further sets forth that controversies, confusion, risks, and multiplicity of suits will result from the resistance of the Company to the enforcement of the inadequate and confiscatory rates of fare prescribed in said ordinance. The bill prays for an injunction restraining the defendants from compelling the Company, or attempting so to do, to operate its lines of street railway in the City of Columbus under the said ordinances; from in any way forcing, compelling, or attempting to compel it, to charge and collect only the rates of fare prescribed by the two ordinances for carrying passengers, and from interfering in any way with the operation by the Company of the lines of street railway covered by the said perpetual franchises.

In the written notice of surrender of the franchises, attached to the bill as part thereof, the alleged facts as to the operation of the Company are set forth much as stated in the amended bill, and the award of the National War Labor Board is set out. The request of February 25, 1918, to the City Council to authorize the Company to charge higher rates, is stated, which was refused, as was a later request. A recital of the recommendation of the War Labor Board for increased rates of fare is also

set out in the written notice. The statement is made that the Company refused to continue the issue and sale of tickets as prescribed in the Blanket Franchise and Center Market Ordinances and to longer operate its cars thereunder; that in order to give good street railway service to the people of Columbus the Company will continue to operate the street railway lines, but not under the two franchises or either of them, upon all of the streets of the City, until notified by it to withdraw from those streets not covered by the aforesaid perpetual franchises, and the Company gave notice that it would thereafter charge 5 cents for a single ride and one cent for each transfer.

The District Court held that the bill made no case properly invoking the jurisdiction of a federal court upon constitutional grounds; that upon the merits, which the District Court considered, the bill should be dismissed for want of equity.

As to the jurisdiction of the court: If the court had decided the case upon the question of jurisdiction alone, that question should have been certified here, and none other would have been presented upon such appeal. (Judicial Code, § 238.) As we have said, the court decided the case upon the merits, and dismissed the bill. As a constitutional question is involved the appeal brings the whole case here. We are of opinion that there was jurisdiction in the District Court to entertain the bill as it presented questions arising under the Fourteenth Amendment to the Federal Constitution not so wholly lacking in merit as to afford no basis of jurisdiction. Jurisdiction does not depend upon the decision of the case, and should be entertained if the bill presents questions of a character giving the party the right to invoke the judgment of a federal court. We think the elaborate and careful opinion of the District Judge of itself shows that substantial questions arising under the Federal Constitution were presented by the bill and that the court had jurisdiction.

Upon the merits the decision of the case turns upon the nature and character of the ordinances granting the twenty-five year franchises. The theory upon which the bill was framed, and the case argued here by appellant, is that the grants were legislative in character, and gave to the Railway Company the right and privilege of using the streets of the City for a period of twenty-five years; that to compel their operation at unremunerative rates is to take the property of the Company without due process of law in violation of the Fourteenth Amendment. The insistence on the part of the City is that under the controlling laws of Ohio, in force when these ordinances were passed and accepted, and the terms of the ordinances, binding contracts were created, obligating the City, which had authority from the State for that purpose, to permit the operation by the Company upon the streets of the City for the period of twenty-five years upon the terms and conditions set forth in the ordinances.

That a city, acting under state authority, may in matters of proprietary right make binding contracts of the nature contained in these ordinances, is well established by the adjudications of this court. *Vicksburg* v. *Vicksburg Waterworks Co.*, 206 U. S. 496.

Whether these ordinances constituted such contracts depends upon the proper construction of the statutes of Ohio in force at the time, and the terms of the ordinances in question.

It is conceded that the statutes of Ohio regulating this matter are substantially the same as those set forth in the margin of the report of the decision of this court in *Cleveland* v. *Cleveland City Ry. Co.*, 194 U. S. 517. After the consideration therein given them, it would be superfluous to state them again or to undertake to repeat the reasons which impelled the decision of the court. In the *Cleveland Case* this court held that upon acceptance of the ordinance it became a binding contract, governed by the rates of

fare authorized to be charged during the period of twenty-five years for which the ordinance ran; that the rates contracted for became binding upon the city, and could not be altered by subsequent municipal action consistently with the constitutional rights of the railway company. Summing up the matter, this court said: "In reason, the conclusion that contracts were engendered, would seem to result from the fact that the provisions as to rates of fare were fixed in ordinances for a stated time and no reservation was made of a right to alter, that by those ordinances existing rights of the corporations were surrendered, benefits were conferred upon the public, and obligations were imposed upon the corporations to continue those benefits during the stipulated time. When, in addition, we consider the specific reference to limitations of time which the ordinances contained, and the fact that a written acceptance by the corporations of the ordinances was required, we can see no escape from the conclusion, that the ordinances were intended to be agreements binding upon both parties definitely fixing the rates of fare which might be thereafter charged." (194 U. S. 536.)

While the precise question now involved was not presented to the court in *Interurban Railway & Terminal Co.* v. *Public Utilities Commission*, 98 Ohio St. 287, *s. c.* 16 Ohio Law Reporter, 447, it is evident that the Supreme Court of Ohio takes the same view of the effect of such ordinances as was declared by this court in the *Cleveland Case.* In the opinion in the *Interurban Railway Case* the previous Ohio cases, as well as the decisions of this court, are reviewed and the conclusion as to the effect of the Ohio statutes is in accord with that announced by this court.

The ordinances involved in this case are specific in their terms, and in the so-called Blanket Franchise Ordinance they obligate the Company during the life of the franchise to furnish adequate and efficient service and first-class,

commodious cars for the accommodation of its patrons. The Company is authorized to charge certain fares during the term named, and no more. It is required to run cars upon certain streets, not in excess of certain intervals. Upon the expiration of the franchise the Company, unless a further renewal be granted, is obligated to remove its tracks, etc., from the streets of the City, leaving the same in good condition.

In the Central Market Franchise Ordinance the time was fixed for the running of the cars, and the size of the trains was regulated. The Company was obligated to pay the City 2% of the gross receipts from local passenger fares during the term of the franchise. The grant was expressly limited to twenty-five years. Upon the expiration of that period the City had a right to purchase upon giving notice two years before the expiration of the term of its intention to do so. We can have no doubt that under the authority of the laws referred to and in view of the terms of the ordinances in question and the acceptances by the grantees the City of Columbus made valid and binding contracts with the Companies, binding for the term of twenty-five years. By these contracts, obligatory alike upon the City and the Company, the City granted the right to use the streets and the Company bound itself to furnish the contemplated service at the rates of fare fixed in the ordinances. We cannot agree with the contention of the appellant that these were permissive franchises, granted and accepted with the right upon the part of the Company to abandon the uses and purposes for which the franchises were granted because the rates fixed became unremunerative as alleged in the amended bill. The authority under which the City acted came from the State, and was granted by proper statutes passed for that purpose. The contracts were made between the City and the Company, and became mutually binding for the period named in the ordinances.

This case does not involve the remedies which may be invoked against a street railway company which is or may become insolvent because of conditions arising since it entered into a given contract. The Company seeks now by its own action to terminate the contracts, still binding upon it by their terms as to rates of fare to be charged, and seeks to have the aid of a court of equity by enjoining the City from any further requirement of service under them.

There is no showing that the contracts have become impossible of performance. Nor is there any allegation establishing the fact that taking the whole term together the contracts will be necessarily unprofitable. This case is not like the *Denver Water Works Case*, 246 U. S. 178, and the *Detroit United Railway Case*, 248 U. S. 429, in both of which the franchise to use the streets of the city had expired by limitation, and it was sought to require continued operation of a waterworks system in the one case and in the other of a street railway system, under rates which would afford no adequate return to the companies. In this case the Company seeks the aid of a court of equity to avoid contracts duly made and entered into while the same are yet in force.

We are unable to find in the allegations in this bill any statement of facts which absolves the Company from the continued obligation of its contracts unless the facts to which we have referred bring the case, as is contended, within the doctrine of *vis major*, justifying the Company in its attempt to surrender its franchise, and be absolved from further obligation.

We come then to consider whether the amended bill shows the happening of an event or events which have released the Company from the obligations of the contract, and authorized it to cancel the same upon the surrender of its franchise. Justification for that course is said to exist in the conditions following the World War

and resulting therefrom, particularly, in the great increase in wages by the arbitral award of the War Labor Board which was due to the necessity of meeting the high cost of living as a direct result of war conditions. This, it is contended, presents a situation that made the subsequent keeping of the contract practically impossible except at a ruinous loss to the Company. It is insisted that the principle recognized by this court in *The Kronprinzessin Cecilie*, 244 U. S. 12, when applied to this case, shows the existence of conditions excusing the performance of the contract. In that case it was held that the master and owner of the German steamship Kronprinzessin Cecilie were justified in apprehending that she would be seized as a prize if she completed her voyage to Plymouth and Cherbourg on the eve of the War, and her return to this country was a reasonable and justifiable precaution in view of the situation; that there was no liability for the shipments of gold agreed to be carried in that case; that the contract, not making an exception in the event of war intervening before delivery of the cargo, the circumstances showing peril of belligerent capture afforded an implied exception to the carrier's undertaking.

Much reliance is had by the appellant on the language used by Mr. Justice Jackson speaking for this court in *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Hoyt*, 149 U. S. 1, 14, 15, wherein it was said: "There can be no question that a party may by an absolute contract bind himself or itself to perform things which subsequently become impossible, or pay damages for the nonperformance, and such construction is to be put upon an unqualified undertaking, where the event which causes the impossibility might have been anticipated and guarded against in the contract, or where the impossibility arises from the act or default of the promisor. But where the event is of such a character that it cannot be reasonably supposed to have been in the contemplation of the contracting

parties when the contract was made, they will not be held bound by general words, which, though large enough to include, were not used with reference to the possibility of the particular contingency which afterwards happens."

Particular reliance is had upon the last sentence of the paragraph just quoted. This language was used in interpreting a contract of doubtful import, as the context shows. Such interpretation was made in view of the situation of the parties at the time when the contract was made, and in view of the nature of the undertaking under consideration. It certainly was not intended to question the principle, frequently declared in decisions of this court, that if a party charge himself with an obligation possible to be performed, he must abide by it unless performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties will not excuse performance. Where the parties have made no provision for a dispensation, the terms of the contract must prevail. *United States* v. *Gleason*, 175 U. S. 588, 602, and authorities cited; *Carnegie Steel Co.* v. *United States*, 240 U. S. 156, 164, 165. The latest utterance of this court upon the subject is found in *Day* v. *United States*, 245 U. S. 159, in which it was said: "One who makes a contract never can be absolutely certain that he will be able to perform it when the time comes, and the very essence of it is that he takes the risk within the limits of his undertaking. The modern cases may have abated somewhat the absoluteness of the older ones in determining the scope of the undertaking by the literal meaning of the words alone. *The Kronprinzessin Cecilie*, 244 U. S. 12, 22. But when the scope of the undertaking is fixed, that is merely another way of saying that the contractor takes the risk of the obstacles to that extent."

In the present case the terms of the contract are not doubtful. The term for which the Company was given

the right to use the streets of the City was definitely stated, and the terms, including the rates of fare which the Company might charge, were explicitly laid down. There is no occasion to interpret general terms in the light of the intention of the parties or the circumstances of the case.

In the *Kronprinzessin Cecilie Case* the unexpected event which excused performance was the imminent danger of the capture of the vessel by a belligerent which would have ended the possibility of performing the contract.

In *Metropolitan Water Board* v. *Dick, Kerr & Co., Ltd.,* decided by the House of Lords November 26, 1917, [1918] A. C. 119, a firm of contractors contracted with a Water Board to construct a reservoir to be completed within six years, subject to a proviso that if by reason of any difficulties, impediments, or obstructions howsoever occasioned the contractor should, in the opinion of the engineer, have been unduly delayed or impeded in the completion of the contract, it should be lawful for the engineer to grant an extension of time for completion. By a notice given by the Ministry of Munitions in February, 1916, in exercise of the powers conferred by the Defence of the Realm Acts and Regulations, the contractors were required to cease work on their contract, which they did. It was held that the provision for extending the time did not apply to the prohibition of the Ministry; that the interruption created by the prohibition was of such a character and duration as to make the contract when resumed a different contract from the contract when broken off, and that it had ceased to be operative. In that case there was a direct intervention of the power of the Government, a feature not appearing in the case now under consideration.

It is undoubtedly true that the breaking out of the World War was not contemplated, nor was the subsequent

action of the War Labor Board within the purview of the parties when the contract was made. That there might be a rise in the cost of labor, and that the contract might at some part of the period covered become unprofitable by reason of strikes or the necessity for higher wages might reasonably have been within their contemplation when the contract was made and provisions made accordingly. There is no showing in the bill that the War or the award of the War Labor Board necessarily prevented the performance of the contract. Indeed, as we have said, there is no showing, as in the nature of things there cannot be, that the performance of the contract, taking all the years of the term together, will prove unremunerative. We are unable to find here the intervention of that superior force which ends the obligation of a valid contract by preventing its performance. It may be, and taking the allegations of the bill to be true, it undoubtedly is, a case of a hard bargain. But equity does not relieve from hard bargains simply because they are such. It may be that the efficiency of the service and fairness in dealing with the Company which performs such important and necessary service ought to require an advance in rates; such was the strongly announced opinion of the War Labor Board. But these and kindred considerations address themselves to the duly constituted authorities having the control of the subject-matter.

We reach the conclusion that the District Court was right in holding that this bill presented no grounds absolving the Company from its contract, and justifying the surrender of its franchise. It follows that the decree is

*Affirmed.*