McCALEB, Justice.
 

 This is an action for damages allegedly flowing from defendant’s nonperformance of contracts of sale and purchase of milled and cleaned rice. The suit is brought in the name of Pacific Trading Company, Inc., a corporation organized under the laws of California, but professedly for the benefit of the United States which, through its alien property custodian, appropriated over 92% of the stock of the corporation under Vesting Order No. 367, executed on November 17, 1942 and supplemental Vesting Order No. 4613, executed on February 17, 1945, These Vesting Orders were issued upon a determination by the Government that 8003 shares (or 96.76%) of the company’s capital stock were actually beneficially held and owned by Japanese nationals and, particularly, that 6291 of those shares, issued in the names of American citizens, belonged to Gunzo Sugihara, an enemy alien, whose last known address was Japan.
 

 The petition sets forth that, on October 24 and 25 and November 1 and 22, 1941, Pacific Trading Company and the defendant, Louisiana Rice Milling Company, Inc., a domestic corporation, entered into certain transactions through a broker in San Francisco for the purchase and sale of rice. Specifically, it is asserted that, on October 24, Monroe D. Green, as' broker for both buyer and seller, confirmed the purchase by plaintiff from defendant of 6000 pockets of rice at a price of $4.20 per pocket f. o. b.
 
 *1089
 
 Arkansas Mill, to be shipped during November and December 1941, 3000 each month, at buyer’s option; that, on October 25th, Green confirmed another purchase of 6000 pockets at the same price f. o. b. Arkansas Mill, 3000 pockets to be shipped during November and 3000 in December, at buyer’s option; that defendant accepted and confirmed 'both of the transactions on November 1, 1941 'by its contracts No. 243 and 244; that, on November 22, Green confirmed the purchase by plaintiff from defendant of 5000 pockets of rice, price $5,375 doubles f. o. b. Arkansas Mill, 2500 to be shipped during January and 2500 during February 1942, at buyer’s option; that the rice sold under defendant’s contract No. 243 was delivered and that contract completed but that defendant, on December 9, 1941, undertook to cancel the other contracts without legal right and that, as a result of defendant’s breach, plaintiff has sustained damages in the sum of $23,825.
 

 Defendant admits the making of the contracts (Nos. 243 and 244) but denies that the confirmation of Green dated November 22, 1941, for the purchase and sale of 5000 pockets of rice, became a binding obligation for the reason that it did not give its consent to the broker to conclude such an agreement. With respect to its alleged breach of contract No. 244 by cancellation on December 9, 1941, defendant maintains that it was entitled to terminate the agreement because (1) plaintiff failed to order the shipment of rice for November; (2) that war with Japan on December 7, 1941 dissolved the contract as plaintiff, a Japanese national, did not have use of its funds except under licenses from the United States; (3) that the war frustrated the contract rendering it impossible of performance and (4) that, at all events, plaintiff was in default by failure to give shipping instructions during the month of December.
 

 Upon these issues, the parties stipulated the facts and the case was thereafter submitted to the court below for decision. Following a dismissal of its suit, plaintiff prosecuted this appeal.
 

 The facts essential to a proper consideration of the questions involved are as follows: Prior to the outbreak of the Second World War, the United States, through the President, “blocked” the bank accounts of businesses believed to have connections with Germany, Italy and Japan. Subsequently, the rigid restrictions were lifted and, through the Federal Reserve Banks, the government issued limited licenses to such firms in order that they might use their funds for business within this country but import and export transactions were prohibited. The plaintiff was believed to have connections in Japan and its bank accounts were “blocked” but, later, it was issued a limited license to do business by the Federal Reserve Bank at San Francisco pursuant to Executive Order No. 8389 of April 10th 1940, 12 U.S.C.A. § 95a note.
 

 
 *1091
 
 The defendant corporation was without knowledge of the fact that plaintiff’s funds had been “blocked" and knew nothing of the limited license under which it was operating. Its initial contact with plaintiff was through the broker, Monroe D. Green, who was distributor for its produce in San Francisco.
 

 As stated above, contract No. 243 for the sale of 6000 pockets of rice was fully completed and forms no part of this suit. Contract No. 244, which called for the delivery of 3000 pockets of rice f. o. b. Arkansas Mill in November, at buyer’s option, and the same quantity under the same conditions in December, had not been even partially performed in November, as plaintiff failed to exercise its option of notifying defendant of the time of delivery during that month. The confirmation order of November 22, which defendant claims did not ripen into a contract, was also executory at the outbreak of the war as the deliveries stipulated therein were for January and February 1942.
 

 On December 7th 1941, shortly after the attack on Pearl Harbor by the Japanese, the Secretary of the Treasury issued Public Circular No. 8, revoking all licenses issued under Executive Order No. 8389, April 10, 1940, authorizing any transaction by or from Japan or any national thereof.. On the following days, December 8 and 9, the defendant was advised of the following facts:
 

 (1) That plaintiff’s place of business in San Francisco was closed by the military authorities.
 

 (2) The interest of Gunzo Sugihara, an enemy alien, in the plaintiff corporation caused it to be viewed as a Japanese national ;
 

 (3) That the Federal Reserve Bank had stated that all trading with any alien must be stopped;
 

 (4) That an official of the bank had stated that any rice enroute to Japanese nationals might be seized by the Government;
 

 (5) That all rice enroute to Japanese buyers would have to be repacked as no American concern would accept rice packed under Japanese brands, and
 

 (6) That no decision had been ma.de by Federal authorities as to what action might be taken in the future regarding the handling of the affairs of concerns operated by the Japanese.
 

 On December 9, 1941, defendant telegraphed Monroe D. Green in San Francisco as follows:
 

 “Notify Pacific Trading Company we have cancelled all unshipped portions of their contracts.”
 

 Later, on the same day, another telegram was sent to Green over the signature of Frank A. Godchaux, Chairman of defendant’s Board of Directors, reading:
 

 
 *1093
 
 “Follow our instructions. Notify Pacific Trading cancellation as per our first telegram today. Don’t flirt with Japs. They are untrustworthy and you know it their action has proven it. Wire me that you have carried out my instructions”.
 

 Green complied with defendant’s demand and communicated the cancellation notice to plaintiff on the same day. Plaintiff did not respond as, at that time, its affairs were in charge of U. .S. Treasury officials and guards were posted at its place of business. On December 15, however, the officers and employees of the company were permitted to have access to its business records and files for the purpose of securing data and preparing applications for a Treasury license to engage in limited transactions. On December 30, it made application to complete contract No. 244 with defendant corporation and, on the following day, the request was granted. Plaintiff thereupon telegraphed the defendant to ship the December rice immediately to San Francisco. This telegram was not received until January 2, 1942, due to the holiday season. Upon defendant’s failure to comply, plaintiff made another demand by letter on January 14, 1942, which was answered by defendant’s President on January 17th, denying any liability under the contracts.
 

 The principal question for decision is whether the circumstances and conditions prevailing on December 9, 1941 were such as to justify the cancellation of the contracts by defendant. The solution of this problem depends upon the effect of war on pre-existing contracts between citizens and enemy aliens and also involves the interrelated doctrine of frustration or impossibility of performance resulting from war, embargo or other supervening events. As would be expected, there is a wealth of authority on these questions but the conclusions of the courts have not been wholly uniform in the various cases which have arisen. It is, of course, generally recognized that, whereas contracts made with alien enemies during the existence of war without specific license or permission of the government are to be considered void insofar as they are inconsistent with the state of war, those made in time of peace with citizens of another country are not necessarily dissolved by the subsequent declaration or existence of war against that country. Am.Law.Inst.Restatement, Contracts, Sections 595 and 596.
 

 In 56 Am.Jur. Section 118, Verbum “War” it is stated: “Such existing contracts are generally considered to be either discharged as from the commencement of war or suspended, according to the nature of the contracts and the extent to which they have been performed when war breaks out.”
 

 It is well settled that contracts which have been performed completely on one side as to create an indebtedness on the other are not dissolved by war but that the right to collect is suspended during
 
 *1095
 
 war and revived an the restoration of peace. Sutherland v. Mayer, 1925, 271 U.S. 272, 46 S.Ct. 538, 70 L.Ed. 943, and cases there cited.
 

 With respect to contracts made before the outbreak of war between the countries of the contracting parties which are executory at the onset of hostilities, the rule is that they are dissolved “when their performance, either during or after the war, would be inconsistent with the duties or allegiance which the parties owe to their respective countries, as in cases where performance involves trading with the enemy or communication across the line of hostilities, or would give aid and comfort to the enemy, or where the parties would be relieved from performance on principles common to cases of intervening impossibility”. See 56 Am.Jur. Section 119.
 

 Excepting the principle of supervening impossibility, it would seem that the case at bar could not be placed within any of the other above mentioned categories forasmuch as the rice was to be delivered here in the United States and it is not contended that a performance of the contract involved trading with the enemy or that it would have given him aid and comfort. It has been stated that a contract for the sale of goods to be delivered to an enemy alien in this country is not terminated by war and that public policy does not necessarily forbid performance during the existence of hostilities. Sutherland v. Mayer, supra.
 

 Restatement of the Law of Contracts, Section 596(c) declares:
 

 “If performance of a contract is rendered illegal during the continuance of war, and prolonged delay in performance is likely to change the burden or nature of the performance promised, either party is justified in changing his position, and if he does so, or if the burden or nature of the performance is in fact changed, the contract is discharged.”
 

 In the instant case, performance of the contract of sale was rendered illegal on December 7, 1941, as the Secretary of the Treasury revoked plaintiff’s license to do business and its establishment was sequestered by the military authorities. Counsel for plaintiff, however, argue that this was a temporary order, merely suspending performance until the restriction on plaintiff was removed by grant of a limited license on December 31, 1941, which did not authorize defendant’s patriotic, but unlawful, action in cancelling the contracts.
 

 Whether the conditions obtaining on December 9, 1941 warranted defendant’s cancellation can be properly determined only by examining the contracts (in respect to subject matter and time of performance) in connection with the particular facts and circumstances which prompted the defendant’s action.
 

 The Court of Appeals of New York, in Neumond v. Farmers’ Feed Co., 244 N.Y. 202, 155 N.E. 100, 101, expresses the law to be applied here, thus:
 

 
 *1097
 
 “The effect of war upon an existing contract between belligerents will vary with the nature of the obligation that is yet to be fulfilled. * * * if the contract is still executory at the beginning of the war, if there are mutual obligations that are yet to be fulfilled, the contract will be terminated when the essential purpose of the parties would be thwarted by delay, or the business efficacy of value of their bargain materially impaired. Williston on Contracts, §§ 1749, 1957, 1958, 1978; Distington Hematite Iron Co. Limited, v. Possehl & Co., 1916, 1 K.B. 811; Metropolitan Water Board v. Dick, Kerr & Co., 1917, 2 K.B. 1, 21, affirmed 1918 A.C. 119; New York Life Ins. Co. v. Statham, 93 U.S. 24, 23 L.Ed. 789; Sands v. New York Life Ins. Co., 50 N.Y. 626, 10 Am.Rep. 535; Cohen v. New York Mut. Life Ins.. Co., 50 N.Y. 610, 10 Am.Rep. 522.”
 

 When we consider the facts of the instant case, we have no hesitancy in upholding the propriety of defendant’s action in cancelling the contracts as it seems clear that, by the advent of war, “the essential purpose of the parties would be thwarted by delay” and “the business efficacy or value of their bargain materially impaired”. To begin with, the subject matter of the contracts was the sale and delivery of rice during specified months. Time was of the essence and the parties were dealing in a commodity which is subject to sudden fluctuations in value. Obligated to deliver at buyer’s option, defendant, upon the advent of war, ascertained (within a three day period) that plaintiff corporation was reputedly Japanese; that the government had seized its offices, revoked its limited business license and frozen its bank account.
 

 Can it be said that all these circumstances, coupled with Federal Reserve Bank warnings against dealings with Japanese, did not afford the defendant lawful ground, as a prudent business operator, in believing that the contracts could not. be fulfilled within the time specified therein? We think not.
 
 [1]
 
 Moreover, it is to be borne in mind that defendant did not know, prior to Pearl Harbor, that plaintiff corporation had been operating on a restricted basis or that it was suspected of being under Japanese control. Therefore, the swift and effective measures taken by the
 
 *1099
 
 government on December 7th against plaintiff corporation came no doubt as a surprise to defendant and gave additional justification for the belief that the government would never sanction a delivery of rice to a Japanese national during the existence of hostilities even though delivery would be made in this country.
 
 [2]
 

 Our conclusion that there was a frustration of the contracts makes unnecessary a determination of the other contentions of defendant.
 

 The judgment appealed from is affirmed.
 

 O’NIELL, C. J., takes no part.
 

 [1]
 

 . In Allanwilde Transportation Corp. v. Vacuum Oil Co., 248 U.S. 377, 39 S.Ct. 147, 149, 63 L.Ed. 312, 3 A.L.R. IS, the Supreme Court of the United States, in dealing with the question of whether an embargo imposed by war was a temporary measure or one which frustrated performance so as to dissolve the contract, observed: “Necessarily, the embargo would be continued as long as the cause of its imposition, - that is, the submarine menace, - and that, as far as then could be inferred, would be the duration of the war, of which there could be no estimate or reliable speculation. The condition was, therefore, so far permanent as naturally and justifiably to determine business judgment and action depending upon it. The Kronprinzess-in Cecilie (North German Lloyd v. Guaranty Trust Co.), 244 U.S. 12, 37 S.Ct. 490, 61 L.Ed. 960.
 

 [2]
 

 . Mr. Arnold D. McNair,
 
 in
 
 an excellent treatise entitled “Frustration of Contract by War”, 56 L.Q.R. 173 (Loc.Cit. 205) submits the following test to be applied in cases of this kind: “Would a reasonable man in the position of the party alleging frustration, after taking all reasonable steps to ascertain the facts then available, and without snapping at the opportunity of extricating himself from the contract, come to the conclusion that the interruption was of such a character as was likely to last so long that the performance or further performance of the contract would really amount to a performance of a new contract? If so, there is frustration. And in considering the probability of the duration he is entitled to assume that insofar as the outbreak or the existence of a war is the cause of the interruption that cause is of uncertain duration. Moreover, the Court will not let him suffer for a determination thus reached if subsequent unexpected events show that he was unduly pessimistic in his forecast.”