PACIFIC TRADING CO., Inc., v. MOUTON RICE MILLING CO.

No. 14027.

United States Court of Appeals
Eighth Circuit.

Aug. 18, 1950.

W. S. Mitchell, Little Rock, Ark. (John H. Riordan, San Francisco, Cal., J. Merrick Moore, Lawrence B. Burrow and Frank E. Chowning, all of Little Rock, Ark., on the brief), for appellant.

Benj. Goodman, Jr., Memphis, Tenn. (Charles Frierson, Jonesboro, Ark., and J. E. McCadden, Memphis, Tenn., on the brief), for appellee.

Before SANBORN, WOODROUGH, and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

This appeal is from a judgment entered upon a verdict directed by the court in an action for damages for breach of four contracts to sell rice. The parties to the action are the appellant, Pacific Trading Company, Inc., a California corporation, with its principal place of business in California, the buyer of the rice, and the Mouton Rice Milling Company, the appellee, a Delaware corporation, operating a rice mill at Harrisburg, Arkansas, the seller. Appellant is engaged primarily in the purchase of rice for resale. Appellee is engaged in the processing and sale of rice which it purchases from growers.

The contracts may be conveniently identified by number. No. 3081, executed October 21, 1941, called for the delivery to appellant by appellee of 1200 pockets of rice at the price of $4.175, shipments to be made when "new crop arrives earliest possible." No. 3193, executed October 25, 1941, called for 3000 pockets of rice at $4.15, to be shipped as follows: "1200 pockets as soon as possible November, 1941.—1800 pockets during December, 1941." No. 3200, executed October 28, 1941, called for 3000 pockets of rice at the price of $4.175, for shipment in December, 1941. No. 3246, executed November 25, 1941, called for 1800 pockets of rice at $5.375, to be shipped at "seller's option at seller's convenience during December, January or February." In the case of each contract delivery to the buyer was complete F.O.B. seller's mill at Harrisburg, Arkansas. Payment of the purchase price was to be made by seller's sight-draft on the buyer, bill of lading attached, one percent discount if paid within ten days. All rice sold was Extra Fancy New Crop Arkansas Blue Rose Coated Rice.

The contracts were prepared by the seller on printed forms adopted by the Rice Millers Association and known as "Uniform Rice Contract For The Sale Of Rice And Rice Products For Deferred Shipment and Future Delivery." The terms of the contracts stated above were inserted by typewriter in the printed forms.

Among the printed terms of the contracts is the following provision:

"(1) Shipping Instructions: The buyer agrees to furnish in writing complete shipping instructions to the seller at least five full business days before the date each shipment is required to be made. In the

event that the buyer should not furnish instructions, the seller may then at his option upon notifying the buyer, cancel this agreement, or sell the merchandise for the account of the buyer, or extend the time of shipment on terms mutually agreed upon in writing."

In the negotiation of the contracts of sale and thereafter the seller was represented by brokers in California. Communications between the seller and the buyer were exchanged through these representatives of the seller.

Of the rice purchased under the contracts, the seller refused to deliver 600 pockets of rice pursuant to Contract No. 3081 and 1800 pockets of rice pursuant to Contract No. 3193. The seller refused to deliver any of the rice purchased under Contracts Nos. 3200 and 3246. This action was brought by the buyer to recover the loss alleged to have been sustained by it by reason of the seller's refusal to deliver the rice purchased.

Of the defenses relied on by the seller in the trial court and here, it is necessary to notice the following: (1) breach of the contracts by the buyer in failing to give the seller shipping instructions; (2) manifestation by the buyer of its inability to perform before delivery of the goods sold; and (3) frustration of the object of the contracts by the action of the United States temporarily prohibiting their performance.

The case was tried upon an agreed statement of facts and the testimony of George Mouton, president of the seller, called as a witness by the buyer.

The parties stipulated that:

1. Pursuant to the Trading with the Enemy Act, as amended, 40 Stat. 415, 50 U.S.C.A.Appendix, § 5, the President of the United States on April 10, 1940, issued Executive Order No. 8389, which as amended on July 26, 1941, No. 8832, 12 U.S.C.A. § 95a note applied to Japan and its nationals. The order imposed a blanket prohibition on "all unlicensed transactions by or on behalf of or involving property interests of any foreign country designated in said order, or any national thereof, including all transfers of credit by the banks, payments by or to banks, and all dealings in any evidences of indebtedness, all evidences of ownership of property by any person within the United States."

2. Executive Order No. 8389, as amended, applied to the buyer in this case, the control of which was in the hands of Japanese nationals. The buyer was accordingly required to and did apply for and obtain licenses from the Treasury Department authorizing the execution and performance of the contracts involved in this litigation.

3. This action is brought with the authority of the Office of Alien Property, Department of Justice, which is now in possession and control of the assets and business of the buyer, under proceedings in conformity with Executive Order No. 9193, 50 U.S.C.A.Appendix § 6 note, issued by the President of the United States under authority of the Trading with the Enemy Act.

4. On December 7, 1941, following the Japanese attack on Pearl Harbor, the Treasury Department revoked all outstanding licenses authorizing commercial transactions by and on behalf of Japan or any of its nationals. As the result of this order the buyer was prohibited from performing any of its unexecuted contracts except as thereafter authorized by the Secretary of the Treasury. The buyer's bank accounts in the United States were frozen, and all banks were prohibited from paying checks drawn by the buyer except as authorized by specific licenses. On December 8, 1941, Treasury guards were placed in buyer's places of business in San Francisco and Los Angeles, and official Treasury Department notices were posted at both places of business stating that the premises were under the control of the United States Government. The Treasury guards and the notices remained on the premises until the Alien Property Custodian took over the affairs of the buyer on November 14, 1942.

5. On December 15, 1941, the Treasury Department issued its Press Release No. 18 announcing that as of that date it had relaxed to some extent the tight restrictions which had been placed upon Japanese residing in this country, and stating that the restrictions referred to had been adopted as a precautionary measure at the

outbreak of the war; that by general license issued by the Treasury Department accounts of Japanese nationals who had continuously resided in the United States since June 17, 1940, were unblocked; and that business enterprises within the continental United States owned by such Japanese nationals were permitted to operate, except in cases in which Treasury representatives were maintained on the premises or official notices posted indicating that such premises were under Government control. The Press Release continued:

"It is anticipated that Treasury representatives and posted notices will be removed from the premises of many Japanese enterprises in which they are now maintained, thus allowing such enterprises to resume normal operations under such general license. It is further anticipated that special business operating licenses will be issued to many Japanese enterprises in which Treasury representatives are continued to be maintained allowing such enterprises to operate under Government surveillance."

6. On December 30, 1941, the buyer completed and presented to the representative of the Treasury Department its application for authority to perform Contracts Nos. 3081, 3193, and 3200; to resell the rice pursuant to contracts theretofore made by the buyer with vendees; or to resell the rice upon the open market. The requested authority was granted on December 31, 1941, at approximately the hour of 11 o'clock A.M.

7. On January 31, 1942, the buyer's application for similar authority with respect to its Contract No. 3246 was granted by the Treasury Department.

8. On December 29, 1941, the seller wired the buyer as follows: "Because of your failure of compliance with the provision of rice sale contracts our confirmation numbers 3081 and 3200 and 3246, we consider contracts cancelled." And on the same date, the same telegram with respect to Contract No. 3193 was sent to the buyer by the seller.

9. On December 31, 1941, at 12:05 P.M., the buyer sent a telegram to the seller's broker in San Francisco requesting immediate shipment of 1800 pockets of rice undelivered under Contract No. 3193, and four minutes later on the same day sent a telegram to the seller demanding immediate performance of the same contract. Both telegrams announced the receipt of authority from the Treasury Department to perform the contracts. The seller's broker immediately advised the seller of its receipt of the first telegram mentioned above. On January 7, 1942, the seller wired the buyer that it stood upon its cancellation notices of December 29.

10. On January 14, 1942, the buyer by letter to the seller insisted upon the performance of all the contracts for the purchase and sale of rice denying the seller's right to rescind the contracts for any cause whatsoever. To this letter the seller replied on January 22, refusing "to rescind our cancellation notice heretofore given you," and stating that the seller had carefully considered all the circumstances and terms of the cancelled contracts, and expressing the seller's regret that the buyer was not "licensed to transact business in this country during the period in which we would have fulfilled the order."

11. At all times pertinent to this litigation the buyer had in appropriate banks sufficient funds with which to pay for all the rice which it had contracted to purchase from the seller, and except for the time that the buyer was prevented by Governmental restrictions from fulfilling its contracts it was at all times able to pay all drafts of the seller for the purchase price of the rice.

The following facts appear from the testimony of the president of the seller and from the exhibits to his testimony and to the stipulation of facts.

As early as November 14, 1941, and continuously thereafter until December 7, 1941, the buyer made insistent and repeated demands upon the seller to ship rice. With the exception of two cars of rice shipped in November (a carload of rice is 600 pockets), the seller failed to comply with any of the buyer's demands for shipment. Its excuse for delay was that rain in the locality of the seller's mill prevented the harvesting of the crops, or that some of

the growers from whom it had purchased rice had sold to other buyers, or that the growers were threshing other varieties of rice and the seller could not make them thresh the rice called for by the contracts, or that the seller was required to make deliveries to other purchasers in California and Utah. During this period the seller advised the buyer that other buyers were granting their sellers extensions of time for delivery, in some cases for as much as six months, thus by implication at least suggesting extensions for it for delivery on its contracts. This situation continued until December 6, 1941, when the seller advised the buyer that it expected to begin shipping rice early the next week. And throughout this period the seller insisted that it had the right to ship at its convenience at any time during December 1941; that shipping instructions from the buyer were only required on receipt of notice that the seller was ready to ship.

On December 9 the seller was advised by its brokers on the Pacific Coast to withhold further shipments because of restrictions placed on trade with Japanese nationals by the Government's action of December 7. From that time until the seller's notice of cancellation of the contracts, the seller was in constant communication with its brokers concerning the situation of the buyer. By the middle of December the seller was advised that some of the Japanese buyers on the West Coast had been authorized to continue business under general license issued by the Treasury Department, that the buyer was expected to be able to secure a license enabling it at least to carry out its contracts for purchase of rice made before Pearl Harbor, and that it was making every effort to accomplish this result. One of the brokers advised the seller to communicate with the Treasury Department of the United States for exact information concerning the situation of the buyer. Approximately on December 26 the seller was advised by its broker that the buyer expected to receive authority to carry out the contracts before the end of the month. During this period the seller maintained that it was prohibited

from shipping the rice by the order of December 7, 1941.

There was a sharp advance in the price of rice beginning early in November and continuing throughout the year. By the end of December, Extra Fancy Blue Rose rice was quoted on the New Orleans market at $6.75 to $7 a hundred pounds and at Stuttgart, Arkansas, at from $7 to $7.25 a hundred pounds. A pocket of rice is a hundred pounds of milled rice.

On December 10 and 11 the seller advised its brokers not to resell the rice involved in the contracts with the buyer. In the words of the seller it was covered "two to one" on all its sales of rice, the available local supply was ten to fifteen times the requirements of its sales, and it expected to make extra profits on all unsold purchases by reason of the price advance. By December 31 it was soliciting orders for Blue Rose rice at $7 a pocket, stating that it could buy the rice from growers immediately after the end of the year. And in January it was accepting orders for immediate delivery at that price.

The contracts sued on did not call for the delivery of any particular lot of rice. Rice of the grade and quality sold was available at other rice-producing sections of Arkansas. It does not appear that the price of rice advanced after December 1941.

While Mouton testified that the failure of the buyer to give shipping instructions within five days of the end of the month in which a shipment of rice was to be made automatically terminated the contracts sued on, and that he gave the notices of cancellation on that ground, he admitted that under the contracts the buyer was not obligated to give shipping instructions until the seller notified the buyer that it was ready to ship, and that the seller had so advised the buyer early in December.

In support of the claim of frustration of the object of the contracts because of the delay occasioned by the action of the Government following Pearl Harbor, Mouton testified that for the seller to hold itself ready to ship the rice on the possibility that the restrictions of trade with Japanese

buyers would be lifted, it would have been necessary for the seller to tie up from 30 to 40 per cent of its capital in holding rice purchased for the buyer, and to fill the storage capacity of its mill with the buyer's rice, with the result that the seller would have been unable to operate or to fill any other of its contracts for the sale of rice. But under examination the witness could not remember whether this calamity in fact occurred. He could not remember whether he had accepted delivery of any of the rice purchased to fill the contracts sued on or what disposition he had made of this rice if delivery had been accepted. He admitted that the Japanese were the only substantial buyers of rice for December delivery, that the seller could have performed the contracts at any time up until December 29, when it gave its notices of cancellation, and that nothing occurred between December 29 and December 31 to change the situation.

Mouton's testimony is unsatisfactory in other respects. He could not remember whether he was advised of the contents of the Treasury Department Press Release of December 15 which contained the information that many Japanese buyers had been permitted to resume operations under general license, and that it was expected that those whose places of business were in the hands of the Treasury Department would be permitted to operate under Government supervision as soon as their affairs could be checked by Government officials. Although Mr. Mouton said that in seeking information on the possibility of performance of the contracts his counsel inquired of the Treasury Department and he inquired of other rice millers under contracts for sale of rice to Japanese buyers, he did not state what information he received from either source.

At the conclusion of all of the evidence, each party moved the court for a directed verdict in its favor. The motion of appellee was granted.

We agree that the question of liability of the seller on the undisputed facts in this record was a question of law for the court. But we think the court reached the wrong conclusion.

In the consideration of the questions presented we begin with the basic rule of the law of contracts that the purpose of every contract is to bind the parties to performance. A party seeking to escape his contractual obligations carries the burden of establishing his good faith in refusing to perform for one of the reasons recognized by law as an excuse for nonperformance. Columbus Ry., Power & Light Co. v. Columbus, 249 U.S. 399, 39 S. Ct. 349, 63 L.Ed. 669, 6 A.L.R. 1648; Kiyoichi Fujikawa v. Sunrise Soda Water Works Co., 9 Cir., 158 F.2d 490, 492; Tipler-Grossman Lumber Co. v. Forrest City Box Co., 148 Ark. 132, 229 S.W. 17.

Obviously the printed provision of the contracts requiring shipping instructions to be given by the buyer to the seller within five full days before the date a shipment of rice was required to be made had no application to the contracts in question since none of them specified a certain date of shipment. Moreover, the parties themselves interpreted this provision of the contracts to mean that the buyer was not obligated to give shipping instructions until notified by the seller that the seller was ready to ship. At the trial, as well as in its negotiations with the buyer, the seller insisted upon this interpretation of the contracts. Early in December 1941, the seller notified the buyer of its interpretation of this provision of the contracts, and the buyer by not objecting agreed. In any event, the seller, having insisted upon this interpretation of the contracts until two days before the last day of performance, is estopped to change his position to the damage of the buyer. See Mente v. De Witt Rice Mill Co., 8 Cir., 251 F. 252.

The evidence does not support, but repels the conclusion that the buyer manifested its inability to perform the contracts within the meaning of section 65 of the Uniform Sales Act, 6 Ark.Stat.Ann. § 68-1465. The section provides as follows: *"When seller may rescind contract or sale.*—Where the goods have not been delivered to the buyer, and the buyer has repudiated the contract to sell or sale, or has manifested his inability to perform his obligations thereunder, or has committed

a material breach thereof, the seller may totally rescind the contract or the sale by giving notice of his election so to do to the buyer."

It may be noted that the seller did not notify the buyer of its election to totally rescind the contracts because of the buyer's manifestation of an inability to perform its obligations, but charged a breach of the contract provision for shipping instructions. While in the circumstances of this case the seller did not waive its right to rely upon other defenses to this action, Mente v. De Witt Rice Mill Co., supra, by claiming that the buyer had breached the contracts by failure to give shipping instructions, its action in so doing after consultation with counsel raises the inference that the seller was not aware of any manifestation by the buyer of its inability to perform its obligations under the contracts. The evidence in the record supports this inference as well as the fact that no such manifestation occurred within the meaning of the Sales Act.

 The order of the Treasury Department of December 7, 1941, freezing the assets of the buyer and prohibiting any transaction by, or on behalf of, or for the benefit of any national of Japan, not only made it impossible for the buyer to pay for the rice while the order was in effect, but, as the seller insisted, made illegal the seller's performance of its obligations under the contracts. Before either party could rely on the Government's action as an excuse for nonperformance, good faith required that it ascertain the exact effect of the order on its contractual obligations, and the avenues, if any, of escape from its prohibitions. Kiyoichi Fujikawa v. Sunrise Soda Water Works Co., supra. The evidence is undisputed that the buyer acted promptly to secure a release from the restraints imposed upon it. It thus manifested its intention to perform, if possible, when the time for performance arrived. Section 65 of the Uniform Sales Act has no application in the situation shown by the evidence in this case.

 Under the doctrine of frustration as relieving a party from its contractual obligations, performance remains possible but is excused whenever an event not due to the fault of either party supervenes to cause a failure of consideration or destruction of the expected value of performance. Courts and text writers generally agree that where performance of a contract is rendered temporarily impossible by an act of the sovereign the result on the obligation of the parties depends upon whether performance after the delay caused by the act of the sovereign would be substantially different from that contracted for. It is said that a temporary impossibility of performance of a character which, if it should become permanent, would discharge a promisor's entire duty operates as a permanent discharge if performance after the impossibility ceases imposes a substantially greater burden on the promisor than that intended by the parties; otherwise, the duty of performance is suspended only while the impossibility exists. Autry v. Republic Productions, 30 Cal.2d 144, 180 P.2d 888, 891; Village of Minneota v. Fairbanks, Morse & Co., 226 Minn. 1, 31 N.W.2d 920, 925; Restatement of the Law of Contracts, § 462; 6 Williston on Contracts, §§ 1957, 1958; 3 Williston on Sales, § 661(c), (e), and (f); United States Trading Corp. v. Newmark Grain Co., 56 Cal.App. 176, 205 P. 29. Necessarily, the application of these rules in a given case must depend upon the intention of the parties as shown by the terms of the contract and the circumstances surrounding its execution. The doctrine of frustration of contracts is based upon considerations of equity and justice as between the parties. Autry v. Republic Productions, supra; Neumond v. Farmers' Feed Co. of New York, 244 N.Y. 202, 155 N.E. 100, 101.

 In the present case it appears that long before Pearl Harbor the seller was in default under Contract No. 3081 calling for delivery when "new crop arrives earliest possible," and under Contract No. 3193 requiring delivery of 1200 pockets of rice in November 1941 "as soon as possible." Conceding that the seller's default in these contracts was waived by the buyer, the seller was not obligated to tender delivery of rice before December 31, 1941. The evidence does not indicate that

delivery before that date was vital to the seller or that delivery thereafter imposed on the seller a burden substantially different from that in the contemplation of the parties when the contracts were executed. A contract to sell a commodity for future delivery is not frustrated by a change in the price of the commodity before the time for delivery arrives. The fluctuation in market prices is within the contemplation of the parties to every contract to sell for future delivery, and the risk of loss attendant upon it is assumed by the buyer and seller alike in the absence of an explicit provision against it in the contract. The evidence in this case, however, does not show that the seller would have sustained any loss by reason of the change in the market price of rice. In fact, the seller's evidence establishes the contrary. It had purchased more than the rice required to fill its contracts before the price advance occurred. Its own evidence shows that it was willing to perform the contracts until December 29, 1941; that nothing occurred between that date and the expiration of the time for delivery under the contracts to change the situation; and that immediately after its attempt to cancel the contracts, and as late as January 20, 1942, it was soliciting and accepting orders for the immediate delivery of Arkansas Extra Fancy Blue Rose rice.

We conclude that there is a complete failure of evidence to show a valid excuse for nonperformance by the seller of any of the contracts sued on. The effect of the action of the United States in prohibiting performance from December 7 to December 31, 1941, was to extend the time of performance of all contracts for both buyer and seller. Both buyer and seller were not only able but bound to perform within the time of performance as extended by the action of the sovereign.

In reaching the above conclusion we have not overlooked the case of Pacific Trading Co., Inc. v. Louisiana State Rice Milling Co., 215 La. 1086, 42 So.2d 855, on which the seller chiefly relies for an affirmance of the judgment below. We have carefully considered the Louisiana case. The buyer in that case was the same as the buyer here, and the seller was a Louisiana rice milling company. The contracts involved in the action, however, differ in some respects from the contracts sued on here, and the facts to which the Louisiana court attributed importance in holding that the object of the contracts was frustrated by the action of the Treasury Department on December 7, 1941, differ in many respects from the facts in the present case. It is possible that the Louisiana case may be distinguished from this on the facts, but, if not, we are unable to follow it.

It follows from what we have said that the judgment appealed from is reversed and the case remanded to the District Court for the determination only of the damage, if any, recoverable by appellant by reason of appellee's breach of its contracts.